No. 70,576

STATE OF KANSAS, *Appellee*, v. DIANA LUMBRERA, *Appellant.*
(891 P.2d 1096)

Opinion filed March 10, 1995.

*Stephen C. Moss*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with him on the brief for appellant.

*Tamara S. Hicks*, assistant county attorney, argued the cause, and *R. Lee McGowan*, deputy county attorney, and *Robert T. Stephan*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: Diana Lumbrera appeals her jury trial conviction of first-degree murder (K.S.A. 1989 Supp. 21-3401). Defendant had been previously convicted of the same offense, but that conviction was reversed by this court on the basis of cumulative trial errors having deprived defendant of a fair trial (*State v. Lumbrera*, 252 Kan. 54, 845 P.2d 609 [1992]).

The victim herein was defendant's four-year-old son, Jose. It was the State's theory that defendant had intentionally smothered the child in order to benefit from his life insurance policy. The child died in Garden City. Additional facts will be stated as necessary for the discussion of particular issues.

## EXPERT REBUTTAL TESTIMONY

For her first issue, defendant contends the district court erred in allowing the State to present certain expert rebuttal testimony. Much of the testimony in this case came from expert witnesses on each side relative to the cause of Jose's death. The State was seeking to prove murder by means of suffocation. The defense sought to establish that death from natural causes was, at least, a possibility. To place the specific issue raised in context, some additional facts need to be set forth.

On the afternoon of April 30, 1990, defendant picked Jose up early from his babysitter's home after being notified he was vomiting. Defendant took the child to St. Catherine's Hospital where he was seen by Dr. Albert H. Gaines, the emergency room physician. A bacterial infection was the diagnosis, and Amoxicillin was prescribed. The physician did not believe Jose had a life-threatening condition, and he was sent home with defendant.

A little over 24 hours later (9:48 p.m.), defendant carried the body of Jose into the same emergency room. After unsuccessful "code blue" efforts, Jose was pronounced dead at 10:25 p.m. by Dr. Michael Shull, a pediatrician.

Also present was Dr. Lauren Welch, a surgeon. Dr. Welch testified that he observed three physical manifestations that made

him suspicious that Jose's death was not from natural causes. First, Jose had petechiae across his face and on his eyelids. Petechiae are pinpoint hemorrhages in the skin that appear as small red or reddish-purple spots. Petechia in this particular distribution signifies an asphyxial cause of death. Asphyxia occurs when a person does not breathe in enough oxygen. Second, there was no obstruction when a tube was placed down Jose's trachea, and his lungs were clear. Third, when a nasal gastric tube was inserted, it revealed that Jose had food in his stomach, indicating Jose had not vomited for some time. Observations two and three seemed to eliminate any obstruction within the boy's body shutting off his air supply, which left asphyxiation by smothering or suffocation.

Dr. Eva Vachal was the pathologist performing the autopsy. Her observations and conclusions were consistent with those of Dr. Welch, leaving smothering as the cause of the asphyxiation. Dr. Luther Frye, an ophthalmologist called in by Dr. Vachal, concluded from his examination of the petechiae present in Jose's eyes that death could not have been the result of natural causes. The State also presented testimony from Dr. Michael Baden, a forensic pathologist, who testified as to his conclusion that Jose had been smothered.

The defense called its own experts relative to the cause of Jose's death. Dr. William Eckert conducted a second autopsy on Jose's body. He testified: (1) Jose had a chronic inflammatory infection in various organs; (2) the petechiae in the boy's eyes was due to dryness; (3) there was no evidence of smothering; and (4) death must have occurred from natural causes.

Dr. Charles Reiner, a pediatric pathologist from Columbus, Ohio, based his testimony on the autopsy reports of Drs. Vachal and Eckert as well as the examination of some tissue slides. Dr. Reiner testified Jose had a widespread viral infection which, by itself, was insufficient to cause death. Dr. Reiner opined, however, that such an infection could inflame the atrioventricular (AV) node of the heart which, in turn, could produce sudden death from ventricular fibrillation. No slides of the AV node had been made at either autopsy. Dr. Reiner testified on April 20, 1993, was excused, and went back to Ohio.

The State notified Dr. Vachal of Dr. Reiner's testimony. Dr. Vachal had the AV node available, made slides thereof, and did further testing. On April 22, the State advised that it wished to call Dr. Vachal as a rebuttal witness relative to Dr. Reiner's AV node testimony. The defense made the following objection:

"Your Honor, we would object to the addition of any new slides or interpretations along the reason that we have never had an opportunity to view these particular slides, much less have our own pathologist or our own expert witnesses review them. We cannot identify or even properly cross-examine Dr. Vachal on the preparation techniques used or the evaluation she would be drawing without the assistance of an expert. And had we received this last week we would have had three experts we could have drawn on to get that advice, but here it is the last hours of the case and I don't have a chance in the world to know what we're talking about, much less evaluate it by way of asking an expert is this in fact what I'm looking at."

The court, after noting that the defense's objection went not to the nature of the evidence but rather to the lack of opportunity to prepare therefor, offered defense counsel a brief recess to discuss Dr. Vachal's testimony prior to her taking the witness stand. Defense counsel then requested a specific finding as to the claim of "surprise." The court replied:

"I have to conclude that under the circumstances as they arose in this case the rebuttal evidence does not constitute unfair surprise or take unfair advantage of defense counsel. All of the evidence before me indicates that Dr. Vachal and the prosecution were not aware of the need to examine this portion of the heart until that need was raised by the testimony of defense pathologists. And so it is truly rebuttal evidence and not evidence which they were prepared to present in their case in chief."

Defense counsel then requested and received time to meet with Dr. Vachal. A trial recess was taken for this purpose. When Dr. Vachal took the stand, she testified that upon being advised by the State on April 20 of the defense testimony relative to the AV node, she and her associate performed additional studies. They dissected the heart, including the AV node, and found no irregularities. She then adhered to her original death by smothering conclusion.

For her first issue, defendant contends that the admission of the rebuttal evidence violated several rights essential to obtaining

a fair trial, including "her right to be free from undue surprise in the State's case, her Sixth Amendment right to confront the witnesses against her, and her Fourteenth Amendment due process right to expert testimony."

Rebuttal evidence is that which contradicts evidence introduced by an opposing party. It may tend to corroborate evidence of a party who first presented evidence on the particular issue, or it may refute or deny some affirmative fact which an opposing party has attempted to prove. It may be used to explain, repel, counteract, or disprove testimony or acts introduced by or on behalf of the adverse party. Such evidence includes not only testimony which contradicts the witnesses on the opposite side, but also corroborates previous testimony. The use and extent of rebuttal rests in the sound discretion of the trial court, and its ruling will not be reversed unless it appears the discretion has been abused to a party's prejudice. *State v. Martin,* 237 Kan. 285, Syl. ¶ 5, 699 P.2d 486 (1985). Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable, which is another way of saying that discretion is abused only when no reasonable person would take the view adopted by the trial court. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. Judicial discretion must thus be considered as exercisable only within the bounds of reason and justice in the broader sense and be considered abused only when it plainly overpasses those bounds. *State v. Cahill,* 252 Kan. 309, Syl. ¶ 6, 845 P.2d 624 (1993).

We now turn to the various contentions made by the defendant. We shall first consider the claim of unfair surprise.

K.S.A. 60-445 provides:

"Except as in this article otherwise provided, the judge may in his or her discretion exclude evidence if he or she finds that its probative value is substantially outweighed by the risk that its admission will unfairly and harmfully surprise a party who has not had reasonable opportunity to anticipate that such evidence would be offered."

Was the refusal of the trial court to exercise the authority granted to it by the statute a breach of judicial discretion? We believe not.

The State had no way of anticipating that the condition of Jose's AV node would be an issue until defense expert Dr. Reiner testified on April 20 that an irregularity therein might have caused the boy's death. A microscopic examination of the conducting system of the heart, including the sinoauricular (SA) node and the AV node, is not a routine part of an autopsy and was not performed by Dr. Vachal during Jose's autopsy because there were no clinical indications that Jose might have a problem with his conducting system. Such an examination is, according to Dr. Vachal, a very complicated and time-consuming procedure.

When defense counsel objected to the introduction of Dr. Vachal's rebuttal testimony on April 22, he stated that if he had the evidence "last week" he could have had the defense's medical experts evaluate it, but that at this late date they were no longer available. He contends the defense was unduly surprised by the offered rebuttal testimony. We do not agree. The only surprise herein was the defense's introduction of a new possible cause of death in its case in chief. It should hardly have come as a surprise to defense counsel that the State would use its rebuttal for damage control of this new alternative theory of the cause of Jose's death. Bringing on an expert to refute the AV node as the culprit would be the most logical way to accomplish this. Further, Dr. Reiner knew that Dr. Vachal had Jose's heart. Dr. Reiner made no request to study Jose's AV node. The defense should have anticipated that further studies would be done by the State following Dr. Reiner's testimony. Further, the trial court afforded defense counsel the opportunity to confer with Dr. Vachal prior to her rebuttal testimony.

Defendant's reliance on *State v. Wacker*, 253 Kan. 664, 861 P.2d 1272 (1993), is misplaced. At issue in *Wacker* was a psychological report on defendant which was not made available to defendant until trial had commenced. We held:

"In a criminal case, evidence not disclosed to the defendant before trial is not suppressed or withheld by the State if the defendant has personal knowledge thereof or if the facts become available to him during trial and he is not prejudiced in defending against them." 253 Kan. 664, Syl. ¶ 5.

The case herein does not involve evidence withheld from the defendant.

Next, defendant argues the admission of the rebuttal testimony violated her Sixth Amendment right of confrontation of witnesses as she no longer had a medical expert of her own with which to confront the State's expert rebuttal witness. Defendant claims that in some unspecified manner her constitutional right to due process was violated by admission of the rebuttal testimony.

It should be noted defense counsel did not request the opportunity to contact any of its experts prior to undertaking the cross-examination of Dr. Vachal on rebuttal.

We have carefully reviewed this issue in each of its claimed particulars and find no merit therein, either individually or collectively.

## OTHER CRIMES EVIDENCE

For her second issue, defendant contends the trial court abused its discretion in allowing the State to introduce evidence under K.S.A. 60-455 of defendant's two prior murder convictions.

After Jose died in Garden City under what were deemed to be highly suspicious circumstances, defendant's prior history was investigated. It was learned she had previously resided in Texas where five other young children of defendant's had inexplicably died at tender ages while under defendant's care. These deaths were each in separate incidents extending over a several-year time span. Defendant was originally tried and convicted in Kansas in the fall of 1990. This conviction was reversed on December 11, 1992. Her retrial occurred in April of 1993. Because of the Kansas prosecution for Jose's murder, Texas authorities opened an investigation into the five Texas deaths plus the death of another young child. Between the times of the first and second Kansas trials, defendant pled nolo contendere to the first-degree murder of two of the children who died in Texas. The State moved to admit, under K.S.A. 60-455, evidence of the two convictions to show motive, intent, and preparation.

K.S.A. 60-455 provides that evidence that a person committed a crime or civil wrong is inadmissible to prove his or her disposition to commit crime, but that such evidence is admissible when relevant to prove some other material fact, including mo-

tive, intent, and preparation. In ruling upon the admissibility of evidence of a prior crime or civil wrong under K.S.A. 60-455, the trial court must: (1) determine it is relevant to prove one of the facts specified in the statute; (2) determine the fact is a disputed, material fact; and (3) balance the probative value of the prior crime or civil wrong evidence against its tendency to prejudice the jury. *State v. Jordan*, 250 Kan. 180, Syl. ¶ 7, 825 P.2d 157 (1992).

At the conclusion of the hearing on the State's 60-455 motion, the trial court found:

"There probably is no evidentiary ruling that a trial court makes that is more difficult than the evidentiary rules that arise under 60-455. I haven't checked, but there may not be a statute that has more citations under it than 60-455. The last that I looked some 228 Supreme Court cases ruling on whether the evidence was properly admitted under 60-455. I'm sure the similarity of these acts is beyond question. The relationship of the victim and the assailant is the same in each case, mother and child. The alleged cause of death in each case is the same, suffocation. In each case the child was covered by insurance and each case the beneficiary was the defendant. In each case the age of the child is of tender years. In each case the defendant was present at the time the death allegedly occurred. In each case the child had been to see or some type of medical treatment had been brought to bear immediately prior to the death. In each case the result was the same, the child died. In each case the funeral expenses were less than the insurance. And in each case the parent secured a pecuniary profit."

The trial court held that the two prior convictions were relevant on the issues of motive, intent, and preparation. The trial court then balanced the probative value of the evidence of prior crimes against its tendency to prejudice the jury and concluded it was admissible under K.S.A. 60-455.

We find no abuse of discretion therein. The factual milieu of this case is so unique and bizarre that it is difficult to compare with other cases where admissibility of other crimes evidence under K.S.A. 60-455 has been an issue. The primary disputed fact in this case was whether Jose was smothered or died of natural causes. If death was by smothering, the evidence was that defendant was the only individual with the opportunity to commit the act.

The defendant took her child into the emergency room for treatment the day before he died, on its face the act of a concerned parent. The next day, defendant took the child to the hospital after he stopped breathing. Again, this apparently was the act of a concerned parent. There are no witnesses who saw what happened to Jose the night he died. The medical evidence from the emergency room and the autopsy supported death by smothering. The concept that a mother would intentionally kill her own young child is so repugnant that such a theory places a heavy burden on the State. Nevertheless, the evidence was that defendant had been previously convicted of two chillingly similar crimes. Shortly before each child's death, medical attention had been sought for the child by the defendant, thereby, according to the State, preparing an official record of health problems which would make the subsequent unexplained death less suspicious. Further, defendant had obtained life insurance on each of the children and financially benefitted from their deaths.

Under the facts herein, we find no error or abuse of discretion in the admission of evidence of prior crimes to show motive, intent, and preparation.

## THREE-DEATH RULE

For her third issue, defendant contends the trial court erred in permitting two of the State's expert witnesses to testify relative to the "three-death rule."

Some additional facts are necessary to the discussion of this issue. The two Texas convictions were for the murders of Jose Lionel Garza, who died February 13, 1978, and Melinda Garza, who died August 17, 1982. Melinda was two years and nine months old when she died. The cause of death listed on her death certificate was acute interstitial broncho-pneumonitis viral and acute heart failure. Jose Lionel was about two and one-half months old at the time of death. Multiple natural causes of death were listed on his death certificate.

After Texas law enforcement officers began investigating the deaths of defendant's children in Texas following the death of Jose in Kansas, medical experts were brought in to study the re-

cords. Prosecution in Texas was commenced, and defendant pled no contest to the murders of Jose Lionel and Melinda. Evidence of the convictions was admitted in defendant's trial herein as discussed in the preceding issue. The State also brought in two pathologists to testify relative to the causes of death in Texas of Jose Lionel and Melinda. It should be borne in mind that these two witnesses were testifying only as to part of the facts underlying the Texas convictions—that is, cause of death of the children, not as to the defendant being the perpetrator of the crime of their murders.

The court permitted defense counsel to voir dire Dr. Robert Bux, a Texas forensic pathologist. After determining that Dr. Bux had based his opinions regarding the deaths of Melinda and Jose Lionel Garza on autopsy reports and autopsy slides, the following dialogue occurred:

"Q. [By defense counsel] Now, in the running commentary that you received from Mr. Bonham, Investigator Bonham [investigating officer in the death of Melinda Garza], am I correct that it gives you a report of the six deaths, six children that belonged to Diana Lumbrera as well as the niece of Diana Lumbrera that died in her care?

"A. Yes sir.

. . . .

"Q. Now in particular when we talk about the multiple number of deaths, as I'm understanding, and please tell me if I'm wrong, that has played a part in the evaluation overall of all of the deaths that you've looked at?

"A. Certainly you have to take that into account when there are a series of deaths to explain each one and all of them.

"Q. And in fact, you have been able to come up with your evaluation that all of these children, all seven children that you looked at were murders based upon the evidence we've talked about, which would generally include this information from Inspector Bonham and the respective medical information that you've received?

"A. I don't have enough to comment on the case in Kansas to have an opinion. I've never seen anything that would allow me to make a judgment on that. I have seen the cases in Texas and I feel qualified to render an opinion in those.

"Q. And in those particular, in those particular cases, you've been able to come up with a conclusion and that conclusion being smothering or death by unnatural cause?

"A. Yes, sir. I believe they're asphyxial deaths of one type or another.

"Q. In reaching that conclusion I've heard the rule cited that one death is probably natural, if it's unexplained, SIDS, but if there's two deaths or more presumption is that it is unnatural; is that a thumb rule that you adhere to?

"A. Only when I do not have an adequate explanation to explain why a person, particularly a baby or a young child died. The second one if I was unable to come up with any kind of, of diagnosis specific, the first one I would, and if it was under a year and they were under a year old or better yet, under ten months, I'd probably call the first one a SIDS, the second one I would call undetermined and the third empirically I'd call a homicide.

"Q. That would be based upon two issues, one that there were at least three deaths; and secondly, in your opinion, they would be inadequately explained or explanation unknown for the death?

"A. That's correct. Provided you've done a full criminal investigation, provided you have done a complete autopsy, including microscopic examination, and provided you have done exhaustive toxicologic studies. If you have done those things, then the answer is yes, sir."

Dr. Bux subsequently testified that both Melinda and Jose Lionel Garza died as the result of asphyxia.

In the voir dire of Dr. Harry Wilson, a Colorado pediatric pathologist, a similar exchange between defense counsel and witness occurred as follows:

"Q. [By defense counsel] Now in reaching your diagnosis as to Jose and Melinda, am I correct that you will be utilizing the rule of thumb that basically says there are a sequence of deaths or series of deaths that will cause you to conclude there must be an unnatural cause of death?

"A. Sir, with regard to Melinda Garza as a case unto itself my conclusion in that case would be that this is an unexpected and unexplained death. And the same would be said by me with regard to the death of Jose Lionel Garza that this is an unexpected and unexplained death. As reviewing that death as a case unto itself. With regard to the death of Jose Lumbrera, this death is unexpected but is explained by the autopsy findings.

"Q. And that explanation being that the child died of what cause?

"A. Died from asphyxiation probably due to suffocation.

"Q. Now, on the initial deaths of Jose and Melinda then you are not in a position to render an analysis of whether or not that was a homicide or smothering death?

"A. As, as individual cases just dealing with the case and the issues and facts, medical facts for that case, the answer is you cannot take that case and, in my mind, argue that it's a homicide. What you have to say is you don't understand why the person died.

"Q. You have, however, written a report to the county attorney's office indicating that in your opinion all seven deaths, which included Ericka Aleman were homicides?

"A. That's correct, sir. And that's based on a pattern and based on the fact that the last death is of itself a homicide, and using that pattern when you have a series of unexplained deaths, unless there is some underlying medical condition that would have caused all those kids to die, that because of the pattern those are also homicides. But there the argument is based on pattern, not based on each case by itself.

. . . .

"Q. Doctor, what would be needed to establish the pattern, how many deaths, would two be sufficient?

"A. Well, in this case the final death stands alone in establishing a murder. So that what you do then is you look back at prior deaths and you say were these deaths unexpected and unexplained. And it makes you highly suspicious. If you had just one other death you would be highly suspicious of that other death, but you might not be able to conclude that that was a murder. But with either six other deaths or two other deaths you would be quite highly suspicious that they were murders. I mean no one knows what happened except the people that were with that person when that person died. I mean no one really knows what happened. You just try to infer the best you can. And when it's an unwitnessed event by anyone else you have to look for patterns.

"Q. And you're looking basically at statistical probability as opposed to a medical evaluation case by case?

"A. That's right. But with a medical evaluation that does not allow you to explain why that child who was alive is now dead. And the other factor that's in here besides unexpected and unexplained is in the presence of the same single caretaker. And in that circumstance then you have to presume that that same single caretaker did something to bring about the death."

Defense counsel argued that the testimonies of Drs. Bux and Wilson should be excluded on the basis that each medical expert's finding did not take into account all the necessary facts, that their conclusions were unreliable, and that the experts were each acting as "a trier of ultimate fact." The court overruled the defense effort to exclude the medical experts from testifying, reasoning:

"First, Mr. Quint [defense counsel] refers to the presumption of innocence that Mrs. Lumbrera enjoys as a benefit conferred upon her by our constitution. And he places, so to speak, in the scales of justice to weigh against them the presumption that Dr. Bux has testified to here this morning about a series of deaths, tending to explain why the deaths occurred. And he says that the doctor's scientific presumption cancels out Mrs. Lumbrera's constitutional presumption

of innocence and that therefore on a constitutional basis the doctor's testimony is inadmissible. The fallacy in this argument is this, Mr. Quint matches the words presumption, but it is what is presumed that determines whether or not the evidence is admissible. Mrs. Lumbrera is entitled to a continuing presumption of . . . innocence until the State proves that she is guilty. Dr. Bux's presumption has nothing to do directly with whether she is innocent or guilty. His presumption goes to the cause of death of a child, and it is for the jury to determine whether or not the cause of death relates directly to Mrs. Lumbrera. Therefore, his presumption and the constitutional presumption are of a different nature."

The trial court then raised a concern it had with the expert's testimony as follows:

"Thirdly, defense is entitled to cross-examine the witness on the basis of his opinion. And the rules regarding the degree of cross-examination are to be liberally construed in favor of cross-examination, in favor of the defense. So the real difficulty with Dr. Bux's testimony here today is not that the basis of his opinion is accurate, because he has testified that the basis of his opinion with regard to Melinda's death and Jose Lionel's death is the autopsy report, the slides in Lionel's case, the blocks and the synopsis prepared by Officer Bonham. I might have some reservations about the accuracy of Officer Bonham's synopsis that was obviously prepared some years later, but the clinical basis, the autopsy reports and the slides do provide a reasonably accurate basis for his opinion. I'm concerned, however, that incorporated into his opinion are the deaths of other children, and I have previously ruled that the prosecution is prohibited from bringing evidence regarding those deaths to the jury."

The court then made inquiry of Dr. Bux as follows:

"If you are capable of testifying in this trial and intellectually and honestly basing your opinion upon the information that you received regarding the deaths of Melinda and Lionel then I conclude that your evidence is admissible in this trial. If you cannot base your opinion on their deaths alone and must incorporate in the basis of your opinion the deaths of the other children, then that places Mr. Quint in a position of having to examine you on their deaths in order to fully explore the basis of your opinion. And what that does is it, to use a non-legal term, it in effect allows the county attorney to bootleg in the evidence of the other deaths which I have already ruled as inadmissible. I can't in good conscience say that I'm going to let you testify and give an opinion based on the deaths of the other children and then simply tell Mr. Quint well, if you want to talk about those other children in front of the jury that's the risk you take. Because if we start out knowing that's the basis of your opinion then that is in effect giving the county attorney an unfair advantage because he is using the deaths of those other children for evidentiary purposes which Mr. Quint is unable to explore. I previously have asked you if you are able to render an opinion based on the deaths of Melinda and Lionel and not on the deaths of

the other children and you answered at that time yes. But now understanding the gravity of my question, is it still your opinion that you can testify here today and use as the basis of your opinion Melinda's death and Lionel's death and exclude intellectually from your reasoning and your conclusion the deaths of the other children?

"DR. BUX: Yes, sir.

"THE COURT: Okay. I accept that and I overrule your objection. And Dr. Bux will be allowed to testify. And you, of course, will be given broad latitude in cross-examining him."

The court overruled the defense objection to Dr. Wilson in similar fashion.

Admission of expert testimony is governed by K.S.A. 60-456(b) and (d):

"(b) If the witness is testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to such opinions as the judge finds are (1) based on facts or data perceived by or personally known or made known to the witness at the hearing and (2) within the scope of the special knowledge, skill, experience or training possessed by the witness.

. . . .

"(d) Testimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact."

The basis for the admission of expert testimony is necessity arising out of the particular circumstances of the case. To be admissible, expert testimony must be helpful to the jury. Where the normal experience and qualifications of lay persons serving as jurors permit them to draw proper conclusions from given facts and circumstances, expert conclusions or opinions are inadmissible. *State v. Hodges*, 239 Kan. 63, 67, 716 P.2d 563 (1986). An expert's opinion, pursuant to K.S.A. 60-456, is admissible up to the point where an expression of opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence. *State v. Lash*, 237 Kan. 384, Syl. ¶ 1, 699 P.2d 49 (1985). Although an expert may give an opinion on an ultimate issue as provided in K.S.A. 60-456(d), such witness may do so only insofar as the witness aids the jury in the interpretation of technical facts or assists the jury in understanding the material in evidence. An expert witness may not pass on the weight or credibility of evi-

dence, for those matters are strictly within the province of the jury. *State v. Graham*, 246 Kan. 78, Syl. ¶ 2, 785 P.2d 983 (1990).

The admissibility of expert testimony lies within the sound discretion of the trial court, and its determination will not be reversed on appeal absent a showing of an abuse of discretion. *State v. Searles*, 246 Kan. 567, Syl. ¶ 8, 793 P.2d 724 (1990); *State v. Colwell*, 246 Kan. 382, Syl. ¶ 7, 790 P.2d 430 (1990); *State v. Stukey*, 242 Kan. 204, Syl. ¶ 1, 747 P.2d 137 (1987).

We find no abuse of discretion in the trial court's ruling relative to the admissibility of the expert testimony of Drs. Bux and Wilson.

The State stayed within the parameters of the trial court's ruling relative to Dr. Bux. The defense's cross-examination exceeded these parameters. Defense counsel asked Dr. Bux specifically about the deaths of two other children of defendant, Joanna and Christopher. Aware of the trial court's limiting ruling, the witness asked the court, in each instance, if he should answer. On redirect, Dr. Bux stated he made his diagnoses as to Jose Lionel and Melinda based on the facts relative to only those children.

Testimony relative to the deaths of Joanna and Christopher was intentionally brought in by defense counsel. This inquiry was clearly beyond the court's ruling, but counsel for the defendant ventured into those forbidden waters and also made sure the jury was aware of the three-death rule and its role in the expert opinion herein as to the deaths of Melinda and Jose Lionel. This deliberate course of action cannot be the basis of a claim of trial court error. See *State v. Bruce*, 255 Kan. 388, Syl. ¶ 6, 874 P.2d 1165 (1994); *State v. Phillips*, 252 Kan. 937, Syl. ¶ 6, 850 P.2d 877 (1993); *State v. Prouse*, 244 Kan. 292, 298-99, 767 P.2d 1308 (1989).

We also note that the deaths of these other children of defendant's were a focal point of the closing argument of defense counsel wherein defendant's loss of her children was characterized as a Biblical tragedy and likened it to Job's loss of seven sons and three daughters. Also, defense counsel challenged the three-death rule as being wholly unscientific. He argued it was the only basis for Drs. Bux and Wilson's testimony as to the causes of death

of Jose Lionel and Melinda which should, accordingly, be afforded no weight.

We find no reversible error or abuse of discretion in this issue.

## ADMISSION OF STATEMENT

For her fourth issue, defendant contends the trial court erred in admitting a statement she made to police officers. A *Jackson v. Denno* hearing was held. The following facts were shown. Officers first interviewed defendant at her home on May 3, 1990. The interview lasted about an hour, was informal, and no *Miranda* warning was given. On May 5, 1990, defendant was requested to come to police headquarters for a further interview. This interview was tape-recorded and lasted from about 12 noon to 3:30 p.m. Near the end of the interview the officers decided to become more "aggressive" and read the *Miranda* warning to defendant. She requested the opportunity to speak with her attorney and was afforded that right, but was unable to reach him. She was permitted to go home. Clearly, the interview ceased upon the request to confer with her attorney. After defendant returned home, the decision was made by the county attorney to arrest her. Defendant was arrested and taken to jail. At about 6:00 p.m. that same day (May 5) one of the interviewing and arresting officers (Elliott) received a call from a jailer that one of the inmates wanted to speak with him. The inmate was the defendant. She was taken to an interview room, again given the *Miranda* warning, and then she executed a waiver of right form. The third interview was conducted by Detectives Elliott and Utz. Although defense counsel does not specifically so state, it appears that the complaint is to this third interview as that is where the incriminating statements were made. During this interview, Detective Utz advised defendant that the evidence showed Jose had been smothered and, essentially, as defendant was the only person with him, she must have done it. The detective indicated defendant nodded her head in agreement.

Detective Utz then told defendant that he wanted to find out why she would have done this because he "wanted to believe it was nothing more than an accident." Detective Utz asked de-

fendant if "she just did not know what she was doing when she suffocated Jose with a pillow." Defendant responded that "it wasn't with a pillow."

Detective Utz asked defendant if she had ever experienced blackout spells where she could not remember what she was doing. Defendant recalled experiencing one at work a few months earlier. Utz suggested that perhaps defendant could have experienced a blackout spell and awakened from it to find herself standing over Jose, finding Jose not breathing, and not realizing what she had done. Defendant responded that she did not do anything intentionally. Detective Utz again suggested the possibility that defendant had blacked out and suffocated Jose without realizing it. Defendant then responded that this was "probably what happened."

At the conclusion of the *Jackson v. Denno* hearing, the trial court held:

"I think that Mr. Quint is correct when he observes that all three of the interviews occurred during the period of time in which the defendant Diana Lumbrera was experiencing emotional and probably physical stress as a result of the death of her son, the funeral and those activities related to that. However, there is not sufficient evidence to indicate that this emotional and physical stress impaired her faculties to the extent that she did not understand the rights that were read to her when they were read to her. There is no substantial evidence here that she did not know what she was saying or what she was doing. The court finds that during the non-custodial interrogations that took place, that there is no evidence of coercion. There is no evidence of threats. There is no evidence of promises. And that the statements that she gave were freely and voluntarily given, and whenever she sought the assistance of counsel she was given the opportunity to contact counsel and whenever she asked that the interview be terminated it was terminated. With regard to the custodial interrogation that occurred last, the evidence is that she was advised of her rights, that she understood her rights, that she freely, voluntarily and knowingly waived those rights and that she consented to the interview. Furthermore, there is not any substantial evidence, in a way there's no evidence at all, that the medication she was taking interfered with her faculties or deprived her of the ability to know and understand what was going on. This was a period of great stress, but that stress alone is not sufficient reason under the law to exclude statements that she gave. The motion to suppress is denied."

The prosecution has the burden of proving whether a confession or admission is admissible. K.S.A. 22-3215(4). When deter-

mining the voluntariness of a statement, the court must view the totality of the circumstances, including (1) the manner and duration of the questioning; (2) the suspect's ability upon request to communicate with the outside world; (3) the suspect's intellect, age, and background; and (4) the fairness of the interrogating officers. *State v. Graham*, 247 Kan. 388, 395, 799 P.2d 1003 (1990); *State v. White*, 246 Kan. 28, 32, 785 P.2d 950 (1990); *State v. Waugh*, 238 Kan. 537, 541, 712 P.2d 1243 (1986).

On appeal, an appellate court will not reverse a determination that a confession was freely, voluntarily, and intelligently given if there is substantial competent evidence to support the determination. *State v. Fritschen*, 247 Kan. 592, Syl. ¶ 3, 802 P.2d 558 (1990); *State v. Alexander*, 240 Kan. 273, 282, 729 P.2d 1126 (1986); *State v. Waugh*, 238 Kan. at 541.

Defendant had a 10th grade education, and was 31 years of age at the time of the interview. She was employed and conversant in English. There is no indication of disorientation, coercion, or mental or physical disability. She had some prescribed sleeping and anti-stress medication but advised the officers at the time of the interview she had not taken any for a couple of days.

We find there is substantial competent evidence to support the trial court's determination that the defendant's incriminating statements were freely, voluntarily, and intelligently given.

## INSTRUCTIONS

For her final issue, defendant contends the trial court erred in refusing to give instructions on reasonable doubt and expert testimony which defendant had requested.

The defendant wanted the reasonable doubt instruction set forth in the federal criminal instructions § 11.14. The trial court had no problem with the proposed instruction as a valid statement of the law, but preferred to follow the recommendation of PIK Crim. 3d. In PIK Crim. 3d 52.04, it is recommended that no separate instruction be given defining reasonable doubt. In *State v. Mack*, 228 Kan. 83, 88, 612 P.2d 158 (1980), a similar issue was raised and disposed of as follows:

"The appellant contends the trial court erred in refusing to give the reasonable doubt instruction approved by this court in *State v. Wilkins*, 215 Kan. 145, 153,

523 P.2d 728 (1974). The trial court instructed the jury on reasonable doubt using PIK Crim. 52.02. Additional instructions defining reasonable doubt are unnecessary. *State v. Ponds and Garrett*, 218 Kan. 416, 421, 543 P.2d 967 (1975). See PIK Crim. 52.04."

PIK Crim. 3d 52.02 was given herein.

Defendant argues that a separate instruction on expert testimony should have been given as such testimony played such a significant role in this case. PIK Crim. 3d 52.14 recommends that no separate instruction be given as to an expert as a witness. The modern trend has been to eliminate instructions which focus on the credibility of certain testimony. See *State v. Willis*, 240 Kan. 580, 731 P.2d 287 (1987).

We find no error or abuse of discretion in the trial court's refusal to give the requested instructions.

The judgment is affirmed.