No. 115,120

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JOHN HUDSON,
*Appellee*,

v.

BOARD OF DIRECTORS OF THE
KANSAS PUBLIC EMPLOYEES RETIREMENT SYSTEM,
*Appellant*.

SYLLABUS BY THE COURT

1.

We review decisions of the Kansas Public Employees Retirement System Board (Board) pursuant to the Kansas Judicial Review Act.

2.

K.S.A. 2015 Supp. 77-621(d) requires that the record as a whole must be considered to determine whether the decision by the Board was supported by substantial evidence.

3.

Substantial evidence is defined as evidence that supports the material findings of the Board in light of the record as a whole.

4.

In making this analysis, we (1) review evidence both supporting and contradicting the Board's finding, (2) examine the Board's credibility determinations, if any, and (3) review the Board's explanation of why the evidence supports its findings. K.S.A. 2015 Supp. 77-621(d).

1

5.

It is an unreasonable and arbitrary act when uncontroverted evidence is not considered by the Board.

6.

When a factfinder has had the advantage of seeing the witnesses testify live and the opportunity to view their demeanor, this allows the factfinder to better assess the candor and credibility of the witnesses. Thus, when administrative law judges have an opportunity to view the testimony of witnesses live, they have an advantage over administrative law judges and Board members who must make their decision based upon reading a transcript or deposition.

7.

A physician testifying as an expert witness may not testify about the credibility of other witnesses' testimony or the weight of disputed evidence.

8.

Under facts such as those of this case, medical opinions of physicians who have examined and/or treated their patients have a greater advantage over physicians who have based their medical opinions on only a paper review of the patients' medical records, unless there is some articulation in the record why their medical opinions are more persuasive than the medical opinions of those physicians who have examined and/or treated their patients. In this case, none of the four experts testified live before the administrative law judge.

Appeal from Shawnee District Court; LARRY D. HENDRICKS, judge. Opinion filed December 30, 2016. Affirmed.

*J. Phillip Gragson*, of Henson, Hutton, Mudrick & Gragson, LLP, of Topeka, for appellant.

2

*Steve A.J. Bukaty* and *Matthew R. Huntsman*, of Steve A.J. Bukaty, Chartered, of Overland Park, for appellee.

Before SCHROEDER, P.J., GREEN, J., and STUTZMAN, S.J.

SCHROEDER, J.:  The Board of Directors of the Kansas Public Employees Retirement System (KPERS) appeals the district court's decision finding John Hudson, who was diagnosed with post-traumatic stress disorder (PTSD), was permanently disabled, unable to serve as a police officer, and entitled to disability benefits. Our review of this appeal is controlled by the Kansas Judicial Review Act, K.S.A. 2015 Supp. 77-601 *et seq.* (the KJRA). Under that standard of review, we find the district court's conclusion was correct—the Board's decision was not supported by substantial competent evidence and was arbitrary and capricious. We affirm.

FACTS

Hudson worked as a police officer for the Kansas City, Kansas, Police Department (KCKPD) from November 1996 to December 2011. In 2007, Hudson became a detective in the child sex abuse unit. He investigated hundreds of child sex abuse cases, often being assigned a new case every other day. In order to investigate his cases, Hudson had to "[go] down to [the suspect's] level" to build rapport during interrogations. Hudson's health records reflect his work in the child sex abuse unit caused his mental and emotional health to deteriorate. As the process was taking its emotional toll on him, he tried to discuss the cases with his coworkers but they refused. The egregious facts of some of the cases affected Hudson more than others.

In March 2008, Hudson was assigned to investigate a report involving a 10-year-old boy with mild autism who was allegedly sodomized by a 22-year-old male. This investigation affected Hudson emotionally. The suspect admitted in great detail to sodomizing the victim, and during the course of the interrogation, the suspect also

3

admitted to sodomizing eight other children. A few days after the interrogation, Hudson experienced nightmares involving the suspect which continued to plague him. Some of the nightmares involved Hudson's own son becoming one of the suspect's victims. He often woke up from his nightmares in a sweat, unable to fall back asleep.

In 2010, Hudson wanted to reduce his exposure to child sex abuse cases and ran for the position of Chief Lodge Steward of the police officers' union. Typically, the officer in that position focused exclusively on union business during duty hours. After being elected, Hudson was assigned to the department's assault unit, then to the missing persons unit, but he continued to receive child sex abuse cases to investigate.

In May 2011, Hudson was assigned to investigate a case that traumatically affected him. The case involved a report of a 12-year-old girl who had been sexually abused by her father on numerous occasions. Her father would pull a stocking cap over her eyes and allow other men to perform oral sex on her for $50. He also punished her for talking to boys by forcefully inserting a flashlight into her vagina, resulting in fourth-degree tears. As Hudson investigated the allegations, the father initially denied any wrongdoing, attempted to blame his daughter, and claimed she inserted the flashlight herself. Hudson arrested the father during the investigation. The father then told Hudson he would "turn out" Hudson's daughter the same way he did his own and that he would be out of jail in 15 minutes. The father promptly posted bond and was released.

Shortly thereafter, Hudson began having nightmares involving his own 8-year-old daughter. In those nightmares, the father of the 12-year-old girl would harm Hudson's daughter while he was powerless to help. The nightmares caused Hudson to wake up and be unable to fall back asleep.

With these reoccurring nightmares, Hudson began to question his career as a police officer. He started having homicidal ideations while interrogating suspects, often

4

fantasizing about brutally beating and killing them. In the summer and fall of 2011, Hudson began applying for positions outside of law enforcement.

One of Hudson's supervisors, Major John Cosgrove, observed a marked change in Hudson's behavior in 2011. Hudson told Cosgrove he would rather kill suspects than get confessions from them. According to Cosgrove, Hudson had trouble concentrating on the child sex abuse cases to which he was assigned and was not getting his work done. Cosgrove noticed Hudson showed signs of paranoia. To keep from being assigned more child sex abuse cases, Hudson avoided his duties as a detective. He covered his patrol car's vehicle locator with foil to jam the signal so he could not be located, and he would tell his supervisors he was performing union duties, when in reality, he would drive to his home, to friends' houses, or to a friend's business to avoid work.

By October 2011, Hudson's performance had declined so drastically the department launched an internal affairs investigation into his work activities. The investigation revealed Hudson was driving around town and not investigating his assigned cases. As a result, he was given the option of retiring from the KCKPD or facing criminal charges. Hudson retired from the KCKPD on December 1, 2011. At the time of his retirement, Hudson had no idea his nightmares, desire to harm suspects, avoidance of work activities, and emotional difficulties reflected he was suffering from PTSD, as he thought PTSD was a condition that only affected war veterans.

After his retirement, Hudson started teaching at a Kansas City school district; however, Hudson's nightmares and other psychological issues continued. As the issues continued to plague him, Hudson spoke with his friend, a KCKPD detective, about what was happening. The detective told Hudson he had a problem and needed to find help. Hudson then spoke with another friend, a former police officer, who suggested Hudson consult with a psychiatrist, Dr. Fernando Rosso. Dr. Rosso interviewed and tested Hudson. He diagnosed Hudson with PTSD, concluded Hudson needed therapy, and referred him back to Dr. Kathleen King for additional treatment.

Beginning in 2005, Hudson attended therapy sessions with a psychologist, Dr. King, for issues related to dealing with his divorce and being able to spend time with his children. Hudson never discussed his work issues with Dr. King prior to ending his employment with the KCKPD. During a 2009 therapy session, Hudson told Dr. King he feared his new girlfriend would disappear with his children but refused to discuss any issues he was facing outside of his personal relationships.

Though his performance as a detective suffered, Hudson did not disclose his symptoms to Dr. King or seek any type of treatment because he knew of two other KCKPD officers whose careers were negatively affected after disclosing they were experiencing psychological difficulties. Hudson worried disclosure of his psychological problems would disqualify him from bidding into the fugitive apprehension unit, a position which he believed would make it impossible for him to be assigned to future child sex abuse cases.

After consulting with Dr. Rosso, Hudson explained to Dr. King the mental and emotional stress that started in 2008 from his child sex abuse investigations and how those cases continued to torment him. Hudson detailed recurring nightmares, homicidal and violent ideations, anxiety, hypervigilance, and flashbacks he experienced as a result of his work as a detective in the child sex abuse unit. With these new disclosures by Hudson, Dr. King also diagnosed him with PTSD. Several months after diagnosing Hudson with PTSD, King drafted a 32-page report that included Hudson's description of his mental and emotional difficulties. Hudson was also seen by Dr. Grace Ketterman, a psychiatrist, who diagnosed him with PTSD and prescribed Xanax to treat his anxiety—later prescribing Lexapro to treat his anxiety and Trazodone to treat his depression.

On March 15, 2012, given the medical issues he was suffering and the diagnoses from his three physicians, Hudson applied for disability through Kansas Police and Firemen's Retirement System (KP&F), a division of KPERS. On his application, Hudson described his disability as PTSD, explaining his work in the child sex abuse unit had

adversely affected him. He listed the date he became disabled as March 24, 2008, since the form required him to pick a date. Along with his application, Hudson submitted two forms entitled "Physician's Report of Member's Condition." One of these forms was jointly submitted by Drs. King and Ketterman and listed the date of Hudson's disability as March 24, 2008. Dr. Rosso completed the second physician's report, listing Hudson's date of disability as December 1, 2011. On April 9, 2012, KCKPD Chief of Police Ricky Armstrong signed a form entitled "KP&F Employer's Report of Disability or On-The-Job Accident," certifying that the KCKPD was aware Hudson's PTSD was related to his work as a child sex abuse detective.

Upon receipt of Hudson's application, KPERS sent the application, reports, and supporting medical records to Dr. Guillermo Ibarra, its consulting physician for psychiatric claims. Dr. Ibarra reviewed the materials and, in his report, concluded he did not believe the experiences Hudson faced in the child sex crimes unit resulted in a disabling case of PTSD. Afterward, Hudson submitted additional information from his three treating physicians to KPERS. Dr. Ibarra conducted another review and concluded Hudson did not have a disabling case of PTSD. KPERS subsequently denied Hudson's claim.

Hudson wrote a letter to KPERS asking it to reconsider its decision, and he submitted additional information from his three treating physicians. Dr. Ibarra conducted another review, again concluding Hudson did not have a disabling case of PTSD. KPERS again denied Hudson's claim.

In preparing all three reports, Dr. Ibarra did not perform a physical examination of Hudson or provide any type of testing, nor did he speak to Hudson or any of his three treating physicians. Rather, Dr. Ibarra formed his opinion solely on the paper records he reviewed, concluding Hudson's claim lacked credibility. Dr. Ibarra correctly stated in one of his reports that the test for benefits under the KP&F is "not whether he has PTSD. The issue is, if [he] has it, if he is disabled because of it."

7

Dr. Ibarra's reports reflected Hudson was not disabled because he left the KCKPD due to misconduct rather than incapacity. In his letters and reports to KPERS, Dr. Ibarra never referenced or applied the diagnostic criteria for PTSD from the Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013) (DSM-V), which all of Hudson's physicians relied on in diagnosing him with disabling PTSD.

On February 15, 2013, KPERS sent Hudson a letter stating he was not eligible for benefits under KP&F. Hudson timely requested an administrative hearing regarding the denial of KP&F benefits. An administrative hearing was held before the administrative law judge (the ALJ). At the hearing, Hudson and Mary Beth Green, a member services officer for KPERS, testified live. As Hudson's experts, Drs. King, Rosso, and Ketterman testified by deposition as did Dr. Ibarra as KPERS's expert. The ALJ denied Hudson's application for disability benefits. Hudson timely appealed the ALJ's decision to the Board. The Board affirmed the ALJ's order in a one-page decision without receipt of any additional evidence.

Hudson timely filed a petition for judicial review in the Shawnee County District Court. The district court reversed the Board's decision adopting the ALJ's decision to deny disability benefits under KP&F. The district court found the Board's decision was unsupported by substantial evidence and was arbitrary and capricious, in violation of K.S.A. 2015 Supp. 77-621(c)(7) and (8). For simplicity, we will refer to the order finding Hudson did not qualify for benefits by the ALJ and the Board collectively as the Board since the Board made the final order subject to appeal.

KPERS timely appealed. Additional facts are set forth herein as necessary.

8

*The KJRA controls our review.*

*Standard of Review*

"We exercise the same statutorily limited review of the Board's action as does the district court, '"as though the appeal had been made directly to this court."' [Citations omitted.]" *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010). This court's review of the district court's decision is bifurcated. First, we must determine whether the district court followed the requirements and restrictions of the KJRA. Second, we conduct the same review of the Board's actions as is required of the district court. *Sheldon v. KPERS*, 40 Kan. App. 2d 75, 79, 189 P.3d 554 (2008) (citing *Jones v. Kansas State University*, 279 Kan. 128, 139, 106 P.3d 10 [2005]).

*Discussion*

When analyzing the Board's decision, we must follow K.S.A. 2015 Supp. 77-621(d), which provides:

> "[T]he adequacy of the evidence in the record before the court to support a particular finding of fact shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record, compiled pursuant to K.S.A. 77-620, and amendments thereto, cited by any party that supports such finding, including any determinations of veracity by the [Board] who personally observed the demeanor of the witness and the [Board's] explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review."

9

"This analysis requires the court to (1) review evidence both supporting and contradicting the [Board's] findings; (2) examine the [Board's] credibility determination, if any; and (3) review the [Board's] explanation as to why the evidence supports its findings. K.S.A. 2013 Supp. 77-621(d); *Redd v. Kansas Truck Center*, 291 Kan. 176, 182, 239 P.3d 66 (2010). The court does not reweigh the evidence or engage in de novo review. K.S.A. 2013 Supp. 77-621(d)." *Williams v. Petromark Drilling*, 299 Kan. 792, 795, 326 P.3d 1057 (2014).

In order to grant relief, the district court must find one or more of the eight circumstances in K.S.A. 2015 Supp. 77-621(c) are present. Here, the district court found K.S.A. 2015 Supp. 77-621(c)(7) and (8) applied, which provide:

"(7) [T]he agency action is based on a determination of fact, made or implied by the agency, that is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

At the center of our analysis is our conclusion the Board's reliance on the deposition testimony of Dr. Ibarra was flawed. The district court acknowledged the Board's credibility determinations could not be reweighed but examined the record to see whether the reasons given for accepting Dr. Ibarra's opinion and then discounting the sworn deposition testimony from Hudson's three treating physicians were supported by the evidence. The district court found the Board's credibility determinations were not supported by the evidence because they were based solely on the deposition testimony of Dr. Ibarra who attacked the credibility of both Hudson and his treating physicians. The Board did not hear any live testimony from Drs. King, Ketterman, Rosso, or Ibarra. Without live testimony, the Board was not in a position to observe the demeanor of the doctors or assess their credibility. See *Giblin v. Giblin*, 253 Kan. 240, 253, 854 P.2d 816 (1993). The district court found that when the Board did not observe testimony of

Hudson's treating physicians or Dr. Ibarra, it was near impossible for the Board to make valid credibility determinations solely on the basis of deposition testimony.

Here, the Board accepted, without explanation, Dr. Ibarra's medical opinion on Hudson's condition over the opinion of Hudson's three treating physicians. Moreover, Dr. Ibarra never tested or interviewed Hudson and never spoke with any of the treating physicians to discuss the basis of each one's diagnosis of PTSD.

We "must consider the credibility determination that the hearing officer made 'who personally observed the demeanor of the witness.'" *Kotnour v. City of Overland Park*, 43 Kan. App. 2d 833, 837, 233 P.3d 299 (2010). Personal observation is important because the statute specifically notes the value of actual observation of the witness when credibility determinations are made. There cannot be an "'apples to apples'" comparison of witness credibility where the Board reviews deposition testimony rather than observing live testimony. See *Rausch v. Sears Roebuck & Co.*, 46 Kan. App. 2d 338, 345, 263 P.3d 194 (2011). When a factfinder has had the advantage of seeing the witnesses testify live and the opportunity to view their demeanor, this allows the factfinder to better assess the candor and credibility of the witnesses. Thus, when administrative law judges have an opportunity to view the testimony of witnesses live, they have an advantage over administrative law judges and Board members who must make their decision based upon reading a transcript or deposition.

As we continue this thought, we see Dr. Ibarra's deposition testimony repeatedly attacked the credibility of Hudson and the three examining and treating physicians. The Board then used Dr. Ibarra's testimony attacking the credibility of Hudson and his three examining and treating physicians to find Hudson and the three physicians' diagnoses lacked credibility. The Board found Hudson's claim that he concealed his problems starting in 2008 from everyone, including his doctors, was not believable. It also found his intentional work avoidance, deception about his whereabouts—covering up his GPS locator with aluminum foil—and the type of treatment his doctors were providing was

11

not sufficient to support his claim of being permanently disabled. The record reflects all three of these attacks on Hudson's claim come from Dr. Ibarra's deposition testimony as he attacked the credibility of Hudson and the doctors who diagnosed his condition and treated him.

Additionally, the Board found Hudson's legal issues over his resignation from the KCKPD, his incarceration for 119 days for an unrelated matter, and the potential financial reward he would receive if the disability was approved discredited his claim. The first of these findings may have some merit since the record clearly reflects he retired from the KCKPD to avoid further legal issues. The next two findings lack support in the record. No physician testified Hudson's incarceration affected the validity of his claim for disability. While in jail, Hudson was never called upon to perform any duties of a policeman or interact with other inmates to find out why they were in jail.

Finally, the Board made a finding Hudson was seeking a "financial reward." We find nothing in the record supporting that finding except where Dr. Ibarra testified about the potential for financial gain and admits he is speculating as he knows nothing about Hudson's financial situation. The reality is all claims for disability have a financial tie to them. Here, the Board failed to use its own judgment to make its determination of Hudson's credibility; it unduly relied on the opinion of Dr. Ibarra. Dr. Ibarra's deposition should have been limited to his opinions about how Hudson's medical records failed to support a finding of permanent disability.

An "expert's opinion . . . is admissible up to the point where an expression of opinion would require the expert to pass upon the credibility of witnesses or the weight of disputed evidence. [Citation omitted.]" *State v. Lumbrera*, 257 Kan. 144, 157, 891 P.2d 1096 (1995). Here, the Board repeatedly relied on Dr. Ibarra's deposition testimony to find Hudson and his treating physicians lacked credibility. The Board failed to explain why Dr. Ibarra's deposition testimony was more persuasive than the three physicians' deposition testimony that Hudson suffered from a disabling case of PTSD. We recognize

12

the ALJ had the opportunity to personally observe Hudson and found his testimony lacked credibility, but that finding lacks support in the record. Though Hudson testified live, the record reflects the Board relied on Dr. Ibarra's deposition testimony attacking Hudson's credibility and the merit of his claim. How can Dr. Ibarra's opinion be more persuasive than the three treating physicians when he never personally examined Hudson? The Board's reliance on Dr. Ibarra's deposition testimony to discredit Hudson and his treating physicians is not supported by the record as a whole.

How does one evaluate the professional opinion of an expert who actually examines and tests the patient versus the expert whose only participation with the patient involved a paper review of the medical records? Is the examining or treating physician's testimony entitled to more weight than the physician who derives an opinion from a paper review? We believe it should be, unless the factfinder clearly states why the physician who performed the paper review is more persuasive.

The lack of direct contact by Dr. Ibarra with Hudson should have been considered by the Board when it evaluated his deposition testimony against the deposition testimony of his examining and treating physicians and the live testimony given by Hudson. The Board failed to specify any facts supporting its finding that Dr. Ibarra's deposition testimony was more persuasive than the testimony of all of the other witnesses. The reliance by the Board upon Dr. Ibarra's deposition testimony, without explanation, was based on a determination of fact that is not supported by the record as a whole in violation of K.S.A. 2015 Supp. 77-621(c)(7).

The district court did not reweigh the evidence or make its own credibility determinations; rather, the district court found the Board's determination without explanation of how the examining and treating physicians' diagnoses lacked credibility was unsupported in the record. The record also reflects the Board relied on Dr. Ibarra's credibility attacks on Hudson to support its finding Hudson was not a credible witness.

13

Thus, we find the district court's analysis, when considering the record as a whole, followed the constraints of the KJRA.

*Hudson's claim was improperly denied.*

### Standard of Review

Next, given our standard of review pursuant to the KJRA, we move on to determine whether the district court's reversal of the Board's denial of Hudson's claim was proper. *Sheldon*, 40 Kan. App. 2d at 79.

### Discussion

In relying on the ALJ's decision, the Board found Hudson was ineligible for disability benefits under KP&F because "at no point in time was he totally unable to perform permanently the duties of the position of policeman." The Board also found Hudson "may very well have [PTSD]," but having PTSD does not necessarily make someone disabled.

### The Board entirely ignored a sworn affidavit.

The Board specifically acknowledged the question at issue is not whether Hudson had PTSD, but whether Hudson was permanently unable to perform the duties of a police officer. The Board found Hudson's treating physicians were unaware of the legal definition of disability as applied to KP&F. However, the Board failed to acknowledge one of Hudson's direct supervisors from the KCKPD provided a sworn affidavit indicating Hudson was totally and permanently unable to perform the duties of a police officer. Major Cosgrove's affidavit detailed his observations of debilitating changes in Hudson's mood and work performance. Major Cosgrove had concerns about the number of cases Hudson was handling and spoke to Chief Armstrong about the matter. It was

14

obvious to Major Cosgrove that Hudson could not get his work done, and his assignment to work child sex abuse cases was having a heavy and negative impact on his demeanor, emotional state, and ability to serve as a police officer. The record contains substantial evidence showing Hudson is permanently unable to work as a police officer. Major Cosgrove expressed: "Hudson can no longer, now or in the future, perform the duties required of a Police Officer," which is the standard for disability under KP&F. See K.S.A. 2015 Supp. 74-4960a(2) ("disabled" means total inability to perform permanently the duties of the position of policeman).

While Hudson's treating physicians may not have specifically known the legal definition of disabled under KP&F, they each understood the definition of PTSD as described in the DSM-V manual. Additionally, Major Cosgrove's statement (which clearly indicated he understood the meaning of being able to perform the duties of a police officer), is direct, undisputed, relevant evidence showing Hudson is unable to serve as a police officer now or in the future. The Board ignored the uncontested affidavit by Major Cosgrove, and its failure to address and consider Major Cosgrove's uncontested affidavit was an unreasonable and arbitrary disregard of relevant evidence.

*Hudson cannot return to work as a police officer.*

Drs. King, Ketterman, and Rosso all shared the opinion Hudson could not return to work as a police officer, and they all personally observed Hudson in diagnosing him with PTSD and evaluating the severity of his condition. Likewise, Major Cosgrove had known and observed Hudson for years as a policeman. He personally knew Hudson's ability to serve as a policeman before and after he began deteriorating to the extent he could no longer serve as a policeman. In contrast, Dr. Ibarra never personally met with, examined, or even spoke with Hudson in determining he did not meet the definition of permanently disabled, nor did Dr. Ibarra speak with Hudson's three physicians. Dr. Ibarra's deposition testimony is the only evidence in the record suggesting Hudson is not permanently disabled. Here, KPERS needed to do more than just have a paper review of Hudson's

15

medical records to support denial of the claim. A full, independent medical examination would have been far more beneficial and provided greater weight in challenging the validity of Hudson's claim. KPERS' decision to rely on a paper review of Hudson's medical records was insufficient, when considered with the record as a whole, to deny Hudson's claim given all of the other medical testimony and the affidavit of Major Cosgrove.

Kansas caselaw recognizes that credibility determinations cannot be readily made where the factfinder does not hear live testimony and have the opportunity to observe the demeanor of the witness. See *Giblin*, 253 Kan. at 253. Similarly, the 10th Circuit has held the opinions of physicians who have never seen a patient should be given less weight than physicians who have examined or treated the patient. See generally *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) (holding in the context of a social security disability claim, "the opinion of an agency physician who has never seen the claimant is entitled to the least weight of all"). We also note another panel of this court recently found in *Buchanan v. JM Staffing*, 52 Kan. App. 2d 943, 953-56, 379 P.3d 428 (2016), that Dr. Do's opinion on Buchanan's medical condition involving her hip and back injury was entitled to less weight than Dr. Murati's opinion. Dr. Murati had actually examined Buchanan's hip and back injury while Dr. Do had not personally examined her.

As previously stated, a factfinder who has heard live testimony and observed the demeanor of a witness is in a better position to make credibility determinations. Under facts such as those of this case, medical opinions of physicians who have examined and/or treated their patients have a greater advantage over physicians who have based their medical opinions on only a paper review of the patients' medical records, unless there is some articulation in the record why their medical opinions are more persuasive than the medical opinions of those physicians who have examined and/or treated their patients. In this case, none of the four experts testified live before the administrative law judge.

CONCLUSION

There is substantial evidence in the record Hudson was permanently unable to perform the duties of a police officer as a result of his PTSD. The only contradictory evidence was Dr. Ibarra's deposition testimony. Dr. Ibarra relied only on a paper review of the medical records in assessing the credibility of Hudson, his examining and treating physicians, and the treatment plan they had developed. The Board's reliance on Dr. Ibarra's paper review undermines the validity of the Board's decision. We recognize we do not make credibility determinations, but we are required to review the credibility determinations made by the Board as we determine whether substantial evidence supports the Board's decision. See K.S.A. 2015 Supp. 77-621(c)(7) and (d); *Redd v. Kansas Truck Center*, 291 Kan. 176, 183-84, 239 P.3d 66 (2010); *Buchanan*, 52 Kan. App. 2d 943, Syl. ¶ 2. The Board unreasonably relied on Dr. Ibarra's testimony against all the other evidence in the record as a whole to deny Hudson's claim.

When reviewing an administrative decision under the KJRA, an appellate court must consider all the relevant evidence in the record, including evidence that detracts from the Board's findings. See K.S.A. 2015 Supp. 77-621(d); *Sheldon*, 40 Kan. App. 2d at 79. Where the Board's action is based on a determination of fact that is not supported by substantial evidence when viewed in light of the record as a whole, the administrative decision must be reversed by the reviewing court. K.S.A. 2015 Supp. 77-621(c)(7). The reviewing court may also reverse the Board's action when such action is otherwise unreasonable, arbitrary, or capricious. K.S.A. 2015 Supp. 77-621(c)(8). Here, the Board's decision was not supported by substantial evidence when viewed in light of the record as a whole. The Board made factual determinations in error resulting in an unreasonable, arbitrary, and capricious decision. We affirm the district court's decision to reverse the Board.

Affirmed.