NOT DESIGNATED FOR PUBLICATION

No. 121,249

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

RAYMOND KAMILA,
*Appellant*,

v.

UNIVERSITY OF KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Douglas District Court; PAULA B. MARTIN, judge. Opinion filed August 21, 2020. Affirmed.

*Edward N. Foster*, of Caldwell Law Firm, P.C., of Kansas City, Missouri, and *Joshua Ritter*, pro hac vice, of Werksman Jackson & Quinn LLP, of Los Angeles, California, for appellant.

*Michael C. Leitch*, senior associate general counsel, of the University of Kansas, for appellee.

Before STANDRIDGE, P.J., ATCHESON, J., and BURGESS, S.J.

PER CURIAM: After considering the testimony of 10 witnesses and reviewing hundreds of pages of evidence presented at a formal administrative evidentiary hearing, a panel appointed by the University of Kansas (University) Vice Provost for Student Affairs recommended that Raymond Kamila be expelled for violating multiple provisions of the Code of Student Rights and Responsibilities (Student Code). The panel made this recommendation in a 23-page, single-spaced written report detailing its findings of facts and its conclusions based on those facts. After reviewing the written report from the panel and all of the hearing materials, the Vice Provost issued a decision letter to Kamila

1

informing him of the agency's decision to expel him from the University for nonacademic misconduct and to ban him from campus for a period of 10 years. Kamila filed an internal appeal with the Judicial Review Board. After reviewing the record and the University's governing rules, the Chair of the Judicial Review Board denied Kamila's request for a hearing to review the University's decision to expel him. Kamila then filed a petition for review with the district court under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. After reviewing the agency record and the briefs, the district court affirmed the University's decision to expel Kamila, finding that he "failed to meet his burden to prove that the University's actions were invalid on any of the grounds asserted in the Petition." Kamila now appeals to this court, claiming that the University's decision to expel him: (1) exceeded the scope of its jurisdiction because it was based on off-campus conduct, (2) was not supported by sufficient evidence, and (3) was arbitrary and capricious. Finding no error, we affirm the district court's ruling.

FACTUAL AND PROCEDURAL BACKGROUND

The allegations leading up to Kamila's expulsion were based on Kamila's misconduct with regard to two different women while all three were students at the University. Although the allegations are similar, they are unrelated. Before setting forth the underlying facts relevant to each allegation, we find it helpful to review the administrative and procedural history that led to this appeal.

*Administrative and district court proceedings*

On April 3, 2017, B.W. filed a formal complaint with the University's Office of Institutional Opportunity and Access (IOA) alleging that Kamila had harassed and stalked her in violation of the University's Sexual Harassment Policy. On April 4, 2017, IOA notified Kamila about the complaint and issued a No Contact Directive prohibiting him from directly or indirectly initiating physical, electronic, or any other contact with

2

B.W. Kamila was notified of both the complaint and the order of no contact later the same day. The IOA conducted a formal investigation into B.W.'s complaint, which included interviewing both B.W. and Kamila, as well as the 12 witnesses identified by B.W. As part of its investigation, the IOA also reviewed evidence provided by B.W., which included copies and screenshots of a multitude of messages to B.W. and some of the other witnesses from Kamila's real Facebook account and what B.W. believed to be Kamila's fake Facebook accounts.

On April 28, 2017, E.T. filed a formal complaint with the IOA alleging that Kamila had harassed and stalked her in violation of the University's Sexual Harassment Policy. That same day, IOA notified Kamila about the complaint and issued a No Contact Directive prohibiting him from directly or indirectly initiating physical, electronic, or any other contact with E.T. The IOA conducted a formal investigation into E.T.'s complaint, which included interviewing both E.T. and Kamila, as well as one witness identified by E.T. As part of its investigation, the IOA also reviewed evidence provided by E.T., which included copies of text messages, e-mails, and pictures that Kamila sent to E.T. between April 5 and April 27, 2017.

On June 23, 2017, after concluding its investigation into both B.W.'s and E.T.'s allegations, Shane McCreery, the University's IOA Director, sent a 28-page, single-spaced Administrative Report of Investigation to Dr. Tammara Durham (Vice Provost for Student Affairs), Lance Watson (Director, Student Conduct and Community Standards), and Aramis Watson (Associate Director for Residence Life). With regard to B.W., the IOA Report set forth her allegations, a detailed summary of the results of the interviews it had conducted with B.W. and Kamila as well as each of the 12 witnesses interviewed, the documentary evidence, the University's Sexual Harassment Policy, comprehensive findings of fact for each allegation, credibility assessments regarding information provided by B.W., Kamila, and the witnesses, a lengthy analysis section at the end of which it determined its finding of facts supported a conclusion that Kamila violated the

3

University's Sexual Harassment Policy, and a recommendation to expel Kamila without terms for readmission and a minimum three-year ban from campus. Specifically, the IOA Report found Kamila had engaged in nonacademic misconduct under Section VI of the Student Code, which subjected University students and organizations "to disciplinary action for violations of laws, published policies, rules and regulations of the University and Kansas Board of Regents, and for the following rules related to the values of the University where the university has jurisdiction." The IOA found Kamila violated the University's core value of respect by:

- Engaging in sexual misconduct that included sexual harassment and sexual violence as defined by http://policy.ku.edu/IOA/sexualharassment (Student Code Section VI.A.1);
- Engaging in retaliatory behavior, direct or indirect, taken to or attempted to harass, intimidate, or improperly influence any individual associated with the student conduct process or any other University grievance or complaint process (Student Code Section VI.A.2);
- Engaging in harm to persons by causing physical harm or endangering the health or safety of any person (Student Code Section VI.A.4); and
- Engaging in stalking, which was defined as a course of conduct directed at a specific person that was unwelcome and would cause a reasonable person to feel fear (Student Code Section VI.A.7).

As a result of these Student Code violations, the IOA recommended that Kamila "be expelled from the University without terms for readmission and receive a minimum three-year ban from campus."

With regard to E.T., the IOA Report similarly provided a detailed summary of the results of the interviews it had conducted with E.T. and Kamila as well the witness identified by E.T., the documentary evidence, the University's Sexual Harassment Policy,

4

comprehensive findings of fact for the allegation, credibility assessments regarding information provided by E.T., Kamila, and the witness, a lengthy analysis section at the end of which it determined its finding of facts supported a conclusion that Kamila violated the University's Sexual Harassment Policy, and a recommendation to expel Kamila without terms for readmission and a minimum three-year ban from campus. Specifically, the IOA found Kamila violated the University's core value of respect by:

- Engaging in sexual misconduct that included sexual harassment and sexual violence as defined by http://policy.ku.edu/IOA/sexualharassment (Student Code Section VI.A.1);
- Engaging in harm to persons by causing physical harm or endangering the health or safety of any person (Student Code Section VI.A.4); and
- Engaging in stalking, which was defined as a course of conduct directed at a specific person that was unwelcome and would cause a reasonable person to feel fear (Student Code Section VI.A.7).

On July 24, 2017, Watson sent Kamila a letter informing him that both of the IOA investigations were complete and that the IOA Report of Investigation had been submitted to Watson for review in his capacity as Director of Student Conduct and Community Standards. In this letter, Watson summarized the factual allegations against Kamila, set forth the applicable sections of the Student Code Kamila was alleged to have violated, informed Kamila that the results of the IOA investigation established Kamila had violated those sections of the Student Code, and told him that the IOA recommended Kamila be expelled from the University. Based on the IOA's recommendation of expulsion, Watson advised Kamila that the cases would be resolved through a formal hearing. In the letter, Watson makes reference to a prior communication, in which Kamila apparently told Watson that he wanted to have the cases resolved through a single hearing and that he planned to have two advisors attend the hearing with him, one of which was his attorney. Watson advised Kamila in the letter that he was permitted to have up to

5

three advisors attend the hearing and that he could submit written materials into the Formal Hearing Panel file as long as he did so at least six days before the hearing. Watson further advised Kamila that the entire Formal Hearing Panel file would be available for him to review beginning three days before the hearing.

The hearing was held on August 10, 2017. Kamila appeared at the hearing in person and with his lawyer. The University presented testimony from seven different witnesses, including the alleged victims, and Kamila's lawyer cross-examined five of these witnesses. Kamila had the opportunity, but declined, to cross-examine the other two. Kamila presented testimony from two witnesses and testified on his own behalf in the form of an uninterrupted narrative, where he had the opportunity to "to tell [his] side of the story" and "explain [himself]." Kamila submitted 137 pages of documentary evidence for review by the hearing panel and referenced that evidence during his testimony. After Kamila's testimony, Watson, B.W., E.T., and Kamila all gave closing statements and the panel recessed to deliberate.

In an opinion letter sent to the Vice Provost a week after the hearing, the hearing panel set forth its finding that Kamila had engaged in nonacademic misconduct violating the Student Code and recommended that Kamila be permanently expelled from the University and banned from campus for at least 10 years. This 23-page, single-spaced letter set forth detailed facts in the record and systematically explained the rationale for each of its findings. In this letter, the hearing panel expressly found that Kamila's denials and overall version of events were not credible.

After carefully reviewing the IOA complaints, the documentary and testimonial information presented at the hearing, the applicable provisions of the Student Code, and the recommendations of the hearing panel, the Vice Provost issued a decision letter to Kamila informing him of the agency's decision to expel him from the University for nonacademic misconduct and to ban him from campus for a period of 10 years. Kamila

6

filed an internal appeal requesting review of the decision. The Judicial Review Board reviewed his request and dismissed the appeal without a hearing, concluding that Kamila failed to state a valid ground for appeal. Kamila then filed a petition for review with the district court under the KJRA. After reviewing the agency record and the briefs, the district court affirmed the University's decision to expel Kamila, finding he "failed to meet his burden to prove that the University's actions were invalid on any of the grounds asserted in the Petition." Kamila now appeals to this court.

*Allegations relating to B.W.*

Kamila met B.W. in April 2016 at a Mexican dance night sponsored by the campus ministry group Called to Greatness (C2G) in Manhattan, Kansas. That was the only time that Kamila interacted with or talked to B.W. in person. More than a month later, Kamila sent the following Facebook message to B.W. at 12:49 a.m. from his personal account:

"Hello [B.W.],

"I hope you are having a wonderful summer at work. Also, I hope you are enjoying every bit of time ministering folks at the C2G as well. Thank you for that night dancing with me, I missed you at that dance bar, as you weren't there. I enjoyed dancing with you that night even though I am not that great at it, but you are awesome. You are a jovial person, and you have a beautiful smile. You said that you would like to have a study session together. Therefore, I would love to have a study session with you when you come to KU; we got a new engineering library, and you may enjoy studying some of the locations within the library. I am excited for your acceptance to KU, you will love it here, as you will be closer to your home as well as to other good churches. I know that you are a good student, maybe you can help me out to organize my notes, also anything that will potentially be helpful. I am counting on you as you have something in you that I don't have, and I would love to explore it, yay! Haha! I would love to be your friend. *If there are any areas where I can invest in your life to help you grow then, I would love to be a part of that as well. [Emojis omitted.]"

B.W. did not reply. A few months later, Kamila sent the following Facebook messages to B.W., again from his personal account and again in the late night/early morning hours:

"Hi [B.W.],

"I haven't had a chance to share my desires with you, but soon I will. I hope you are doing well.

"I haven't forgot about it. You were in my thoughts for the whole summer and I have a list of things to share with you. I hope that your school is going well for you.

"If you are the person written in my life then by all means I would like to pursue you of who you are. I really can't live this life by myself at all and I truly mean it.

"I am up awake thinking of you and I really don't know why?

"I was just reading the book of Genesis!

"I just felt like that you have a loving and kind mother.

"I am really excited to see you *as person*.

"Hello [B.W.],

"I just wanna tell you the truth that I have a crush on you, I am not playing games, and I really don't see you as an object just like any typical guy will look at someone else. I am thinking of you and I am praying for you as well. I will be giving you a list of my desires. I will also make sure to point things out to you about why do I like you or why am I attracted to you as well?

"This week on Sunday, I will be in Lawrence. If you were happen to visiting the [Morning Star Church] then I will see you. Thinking and praying about you. [Emojis omitted.]" (Emphasis added.)

B.W. did not respond and shortly thereafter blocked Kamila from all of her social media accounts.

The day after she blocked Kamila from her social media, B.W. approached Rich Lorenzo, the president of C2G who managed the campus ministries at each university in Kansas in which it had a presence. Specifically, B.W. asked Lorenzo to speak with Kamila and let him know that his advances and attempts to contact her were unwelcome and were making her feel uncomfortable. Lorenzo passed that message on to the local

campus director, Wayne Simien. Although Simien initially tried to take care it, Lorenzo ultimately had to speak to Kamila. Lorenzo explained to Kamila that he could continue to be a part of C2G only if he stopped harassing women in the ministry, including sending them messages after he had been blocked and told to stop. Lorenzo also specifically told Kamila to stop contacting B.W. Lorenzo reported that it was a good conversation and that Kamila was agreeable with everything they discussed. For his part, Kamila denied that any such conversation took place.

About a week later, B.W. received the following Facebook messages from an account going by the name of "Jake Foster":

"Can we be cool and awesome friends [B.W.]?

"I wanna talk to you [B.W.]

"I told [Lorenzo] that I will wish you a Happy Birthday, I just wanna say that 'Happy Birthday' to you [B.W.]. In other words, I will say 'Happy Birthday' bomb shell bay bay, tehe. I got that name from your twitter account, so I like it[.]

"I know you are mad at me because I didn't add you but I will do everything to compensate this to make you feel happy when I see you *as person*. I promise. . .

"[B.W.]! May lord bless you today, yay."

"Hi [B.W.], I apologize and I am sorry that I didn't add you on Facebook for several reasons . . .

"1. I wanted to talk, get to know you, and hang out with you *as person* more than through by social media.

"2. I just didn't wanna give you a wrong message with anything else[.]

"Etc. . .

"It's nothing secretive or I am hiding anything from you. I truly believe that I wanna do a good job about knowing you. I felt hurt of seeing you little distant, as I have let you known my interest towards you and I never had a chance to talk to you *as a person*.

"Reason, I wanted to meet you at the church so that you may feel comfortable in a social settings. I was thinking more of you. . .

"I added you on twitter[.]

9

"I wish you can see things little bit clearly for me and I really do wanna wish you on your birthday.

"I truly believe that I will do a good job about being your awesome friend. Thinking of you [B.W.].

"I want to reach out to you and I want to talk to you. You seem like an awesome person that I am interested in. . .

"I wanted to ask you out if I would have seen you *as person* at Church. . .

"I truly believe that I care about you and I am attracted to you. . .

"I don't know how to talk to you *as person* and tell you everything. I hope you can make things easier for me, as I felt sad of seeing you completely going mad of me not adding you on Facebook and I feel sorry about it. I had reasons for it. . .

"I wanna meet you *as person* and be good about who I am. . .

"I never realized that we have almost the same facial structure and same eye color as well. I realized that you got some calluses when I held your hand and it tells me that you workout a lot.

"Its [*sic*] awesome [B.W.].

"I wanna wish and sent you something for your birthday, it's the only reason I wanted to meet you this past Sunday. [Emojis omitted.]" (Emphases added.)

Based on the content of the messages and the unique writing style (particularly the use of "as person" when the writer meant "in person"), B.W. believed that the Jake Foster messages were coming from Kamila; therefore, she did not reply and blocked the account. Kamila denied creating or using a Facebook account under the name Jake Foster.

During this time, Lorenzo encouraged B.W. to stay away from C2G events because he did not know whether Kamila would show up. When B.W. continued to receive harassing messages, Lorenzo arranged to meet with Kamila again. At that second meeting, Lorenzo reiterated that Kamila was to stop contacting B.W. Lorenzo then went a step further and told Kamila that he was no longer welcome at either C2G or Morning Star Church—a local church associated with C2G—events because "[w]omen [were] scared to come to church." Kamila, again, denied that any such meeting took place. The

10

day after this second meeting with Lorenzo, Kamila contacted B.W.'s best friend on Instagram to ask about B.W. The best friend did not respond for two weeks; but when she did, she told Kamila to leave her and her friends alone because he was making them "feel extremely uncomfortable." Kamila replied with a long and rambling message about his feelings for B.W. That message purportedly prompted the best friend's husband to tell Kamila to stop contacting his family.

A few months later, B.W. received flowers at her off-campus residence where she lived with her cousin. The flowers were sent anonymously, but B.W. believed they were from Kamila because they came with a note that reportedly contained similar themes and used similar verbiage as his previous messages. This scared B.W. because she did not know how Kamila found her address, which was not listed or otherwise publicly available.

After the flowers incident, B.W. became fearful of the lengths that Kamila would go to pursue her, particularly because she still did not know how he was able to discover her address. She became worried that he may be following her or hacking into her computer. She even considered moving because the cousin that she was living with had small children in the house. To allay her fears and make another attempt to get Kamila to stop contacting her, B.W. reached out to her brother (Brother) and asked him to talk to Kamila.

Brother had first met Kamila a few years earlier when the two went to a movie together as part of a larger group, but they did not remain in close contact after that. When Brother realized that Kamila was the one harassing B.W. and her best friend, he arranged to go to church with him and then get lunch afterward. During lunch, Brother tried to let Kamila down easy while still being very clear that he was to leave B.W. alone. Kamila reportedly asked Brother if B.W. thought he was "'weird because of the flowers'" and if Brother could arrange for him to talk to B.W. one more time. Brother said he

would pass Kamila's message along to his sister, even though he knew already what B.W. was going to say. At the end of the meeting, Brother made Kamila parrot back to him "'I get it . . . I will stop contacting her.'" Brother walked away thinking it was a "'major breakthrough.'"

A week later, however, B.W. reported to Brother that she was still receiving messages from Kamila. Upon hearing this news, Brother texted Kamila to remind him that he had agreed to stop contacting B.W. and to reiterate that B.W. did not want to be his friend and did not want to talk to him or hear from him. Kamila responded by telling Brother that he did not trust him and was not going to listen to him, making it clear to Brother that he "had an objective . . . to be with [B.W.] no matter what the cost." Brother later received threatening text messages from unknown phone numbers and believed that they were from Kamila because of their content and their use of the phrase "as in person" instead of "in person." For his part, Kamila claimed that Brother did not tell him to stop contacting B.W. and denied sending any threatening text messages from unknown/fake phone numbers.

On March 31, 2017, B.W. made a report about Kamila's conduct to Annie McBride of the Emily Taylor Center for Women and Gender Equity who, in turn, submitted a report to the IOA. Two days later, on April 2, 2017, B.W. received the following Facebook message from an account going by the name of "Morgan Hashford":

> "Dear [B.W.],
> "For me, nothing matters to me than just having a friendship with you and define who I am by being vulnerable to you, but I don't want guys to check out me. Last year, I saw something in you, and at that time I believed in you. I know that you don't want to set yourself a failure to me or something. I want you to explore everything about me, and I want to do the same about you *as in person*. Everything I am writing is what I am feeling right now about you. Not because someone asked me to do this… I want to know your story, and I want to know what makes you a [B.W.]. Why on earth I had a crush on

[B.W.], not on [Brother]? Lol I am not trying to use you to replace my need, or neither I am asking you to do this for me. I like your personality and your lovful [*sic*] heart. There is nothing to hide about it. I don't want you to live in a fearful distant friendship because I am not the kind of person you may be thinking. Individuals and community around you are defining you things with fear-based, and it's not okay. Most of these people don't know me very well, and I am upset that you can make this easier for me. I don't want to be treated like I was by someone in the past. I prayed for you, and I certainly feel about you, [B.W.]. I want to be a friend to you, and I want to hang out with you. I hope you will please allow that to happen because I think about you and I am not sure who else to reach out to about it. [Emojis omitted.]" (Emphasis added.)

B.W. did not reply and immediately blocked the "Morgan Hashford" account because she believed, based on the content and the unique writing style, that the messages were from Kamila. The Morgan Hashford account also sent the following Facebook messages to Brother's girlfriend:

"In case you don't know about [Brother]. He actually slept with 50-60 girls in the past. He used all those women for sex and this guy is just an awful prick. I know that you felt for his looks and the time you know him. He and his sister are ex[ac]tly like him.
"I am trying to help you out that don't commit for more with this scumbag[.]"
"He uses others for his own need[.]"
"He told me that he wants you to come from Texas to Kansas[.]"
"He is just the worst little do[u]chy guy."

Kamila denied creating or using a Facebook account under the name Morgan Hashford.

On April 3, 2017, B.W. filed a formal IOA complaint against Kamila. Kamila was notified of the complaint and was issued a No Contact Directive regarding B.W. the next day. Later that evening, Kamila was captured on security cameras entering Jayhawker Towers A and C around the same time that disparaging fliers about C2G and the Morning

13

Star Church were distributed in those areas. Those fliers featured the photos and names of leaders from both organizations and stated:

"BEWARE OR FAKE MINISTRY AND REMEMBER THESE PICTURES!! CALL 911 AND REPORT IT TO COP WHENEVER YOU SEE ANYONE OF THESE PEOPLE WHO ARENT A STUDENT. PROTECT YOURSELF FROM THESE PEDOPHILES AND SPREAD THE WORD ACROSS CAMPUS!

"If anyone of these people tries to reach out to you, talk to you, share any false gospel or ask you to come to 'Called To Greatness' or 'Morning Star Church' by all means, refrain from going or even committing to it. These are selfish racist punks. They treat minorities and people of color with disrespect. Not to mention, some of these pricks physically and mentally abused, threatened, stalked, and assaulted a lot of students. They are the worst human beings on earth. PLEASE DO NOT FALL FOR THESE MANIPULATORS OR IGNORANT REDNECKS."

And on May 5, 2017, a Facebook account going by the name of "Melania Trump" initiated the following message exchange with B.W.'s friend, G.O.:

"[Trump:] Stay away from [B.W.] as she isn't a trust worthy [*sic*] girl. She will hurt you as she is a player. She is part of cult group of people on town.

"It's for your good sake, please stay away from her[.]

"[G.O.:] Sorry whose [*sic*] this?

"[Trump:] You don't need to know[.] I am trying to save yo[u] from this girl[.] I am her ex-boyfriend[.] You[.] She has done the same thing to other guys as well[.] Her brother name . . . is a corrupted con artist[.] Stay away from these people[.] They will use you and then throw you away[.] She added you on Facebook to stalk your profile[.]

"[G.O.:] Okay I really appreciate your concern but I think I can make my own decisions. And it would be great if you would stop speaking ill of others.

"[Trump:] 1st Amendment rights[.] I will do whatever I can[.] I am doing a favor for you[.] I am not here to hurt you[.]

"[G.O.:] Thank you Mrs. Trump but I'll be just fine[.]

"[Trump:] You will remember me later on what I just told you about it[.] She is a con artist[.] Don't fall for it[.] [T]hanks[.] Have a goodnight[.]

14

"[G.O.:]  Please don't communicate with me anymore as I don't believe you[.]

"[Trump:]  Well! Ask some of her prior people that she interacted with[.] I was just like you[.] I was wrong later on as people told me the truth about her[.] She slept with quite a bit of guys[.]

"[G.O.:]  And you're done.

"[Trump:]  Can you say this to my face *as in person*? If you have balls[.] Fuck yourself douche[.]" (Emphasis added.)

G.O. did not reply to the last message and blocked the Melania Trump account. The next day, however, G.O. received the following Facebook message from an account going by the name of "Donaldico Trump":  "[S]tay the fuck out of [B.W.] or any [B.W.'s family], they are evil and fake people[.]"

G.O. did not reply. B.W. later stated that, based on the content as well as the unique verbiage and writing style of the messages, she believed Kamila was responsible for both Trump accounts. Kamila denied creating or using a Facebook account under the name Melania Trump or Donaldico Trump.

A week later, B.W. received a phone call from an unknown number at approximately 3 a.m., which woke her up and led to the following text message exchange:

"[Unknown Number:]  Hey [B.W.]

"[B.W.:]  Who is this?

"[Unknown Number:]  What's up [B.W.]?

"[B.W.:]  I think you have the wrong number.

"[Unknown Number:]  Nope! I am the one who cares about you and have interest in you. . . You shouldn't have treated me poorly despite the fact whoever asked you to do so. I genuinely liked you and I had an interest to take you out or so. . . . I wish you would have made things little easier for me [B.W.]. *bit. You chose to hurt me for no reason. I forgive you for it. Can we atleast [*sic*] meet sometimes and talk? You never had an actual

conversations with me to know the kind of guy I am for you. . . *As I know that you were asked to do so, also whoever shared false stuff about me are just a gossiper which is fine. I would have shared everything about me to you *as in person* to you, if you would have hung out with me. . . Instead of listening to false made up biased who doesn't know me *as in person*. . . *biases. I mean, I really wanted to have a meaningful conversations with you and I wanted to be a good friend to you etc. . . Let me be honest about why I was interested in you. . . 1. You were a good student->It was attractive to me and you can't deny that ->I know that lot of Kansas conservatives or republicans or there are people who wouldn't like you because of that, but I am opposite because it's what I like about you. 2. I saw something in you and I felt for it not because you are beautiful but something I saw in you and I know it. 3. You are Christian and you have values to go with. 4. I thought that you will help me in certain areas as I wanted to work things out with you. 5. Your BS clearly tells me that you know how to deal with conflicts etc, so I was convinced that you are good with communications. 6. I like your lifestyle choices, I meant->working out, playing basketball, etc->I want you to but you didn't me share all these *as in person*. 7. You like beach, and adventure, just like I do. I wish would have shown you theng [*sic*] at beach or going for a walk something->I guess it was just a dream and currently it looks all fake to me because of evil cult person name [name omitted] (you may not see it, but he is). Anyways, it's all I got for you. You already know the rest I shared in the past. I hope you enjoy the rest of your night sleeping."

B.W. did not respond because she believed, based on the content as well as the unique verbiage and writing style, that the text messages were from Kamila. This scared her because, as with her off-campus address, B.W.'s phone number was unlisted, and she did not know how Kamila found it. Kamila denied having B.W.'s phone number and also denied using a fake/unknown number to call and text her.

During the IOA investigation and at the administrative hearing, B.W. repeatedly described how Kamila's conduct had a negative impact on her academics and caused her to fear for her safety both on campus as well as at home. She also described how his conduct caused her to experience nightmares and a high degree of stress because she did

not know how he found her private information or "what he was capable of." B.W. said she "felt threatened in every way of [her] life."

*Allegations relating to E.T.*

Kamila met E.T. on April 5, 2017, at a Velocity Church/All Saint's Church college life group. Afterwards, E.T. sent Kamila the following text message:

> "Hey Ray! It's [E.T.] from group tonight. So tomorrow with Campus Christians at 7 o'clock we have a worship service at 1320 Ohio st. You should totally try to stop by. We have a great group of guys that would can get plugged in with and if you're interested in a men's bible study with them after meeting them I can give you that information, as well as a meal we all have on Mondays. We have a really great community built up and would love for you to join the family. Also thank you for being so honest tonight. It was nice to hear your story and get to know more about you. Hope to see you tomorrow!!"

E.T. later said that she reached out to Kamila because her faith called her to love others and her church was all about telling others that they belong. The two exchanged a number of text messages over the next few days, most of which consisted of religious songs, Bible passages, and prayer requests. Kamila also sent E.T. a collage of clothed selfies and photos from a microbiology lab at Purdue University for E.T. to show her roommate. As time went on, however, Kamila sent E.T. more and more messages, and her replies became less and less frequent until she stopped responding entirely on April 11, 2017. E.T. later said the texts, songs, and photos were "just a whole lot really fast" that made her feel uncomfortable. E.T. also believed Kamila was manipulating her because he repeatedly referred to her as his "'sister in Christ'" and she "didn't want to be the jerk that said, no I don't want to be your sister in Christ." She believed Kamila was using her religious beliefs against her.

17

Despite not receiving any more responses, Kamila continued to text E.T. On April 11, Kamila texted E.T. 18 times. He sent her nine more text messages between April 12 and April 16, letting her know that he wished her well and that he enjoyed seeing her or missed seeing her at Campus Christians events. He also sent her additional photos, religious songs, and links to sermons and articles from the website desiringgod.org. Again, E.T. did not respond to any of those messages. At this point, E.T. asked Matt Myer, a leader within the Campus Christians organization, to speak to Kamila and tell him to stop contacting her. Although Myer had not personally observed Kamila showing a particular interest in E.T., Myer concluded from the facts provided by E.T. that Kamila was trying to pursue a romantic relationship with her. In fact, Kamila had expressed his desire to have a family during a Bible study session and said it was his goal to be married within a year.

On April 25, 2017, Myer spoke to Kamila about his interactions with E.T. after a men's Bible study at the Campus Christians house just off the University's campus. Myer made it clear that Kamila was making E.T. feel uncomfortable and that Kamila needed to stop contacting her. Kamila asked if he could reach out to E.T. to apologize, but Myer said no. At the end of the conversation, Myer believed he and Kamila were "on the same page" about Kamila not contacting E.T. But immediately after leaving the Campus Christians house, Kamila went to the University's Anschutz Library where E.T. was studying with friends. Kamila walked straight up to her and—with what E.T. later described as a "very firm" look about him—asked to speak with her privately. E.T. was scared and believed that Kamila might physically hit her, but she went with him anyway to a quiet study area near the stacks. When they were alone and out of sight of E.T.'s friends, Kamila told E.T. that he never intended to make her feel uncomfortable. E.T. tried to explain that he was just "way too much too fast," but he was not listening to what she was saying, so she eventually just let him talk, even though she said he was not making much sense.

When Kamila was done talking, he followed E.T. back to where her friends were studying and asked if he could join them. E.T. was still scared of what Kamila might do so she stayed silent; she did not say no but she also did not say yes. Kamila sat down. After doing so, Kamila asked E.T. if she would review a video that he made for one of his classes. Kamila claimed that peer reviews were required for the assignment. A later review of the class syllabus, however, revealed that this was not the case. E.T. reluctantly gave Kamila her University e-mail address, which led to the following e-mail exchange:

> "On Apr[il] 25, 2017, at 10:42 PM, Kamila . . . wrote:
>> "[attached a YouTube link].
>
> "On Apr[il] 26, 2017, at 11:16 AM, Kamila . . . wrote:
>> "This is private [E.T.] :), so please don't forward or share it with anyone else.
>> Thank you for being an awesome sister-in-christ and understanding me.
>> "—Ray
>
> "On Apr[il] 27, 2017, at 12:52 AM, Kamila . . . wrote:
>> "Hey [E.T.],
>> "I didn't get a response back from you. I hope you did well on your child development test yesterday. This video, It's actually for one of my current class [*sic*] that I am in, and if you feel like sending feedback it to me then it's kind of you, else it's okay. I meant to sent this to you as you mentioned that you will do it to me on Tuesday night when I met you *as in person* at 2nd floor of Anschultz library.
>> "—Ray
>
> "On Apr[il] 27, 2017, at 7:58 AM, [E.T.] . . . wrote:
>> "Stop talking to me.
>> "[E.T.]
>
> "[On April 27, 2017, at 9:24 AM, Kamila wrote:]
>> "Great! I wish you wouldn't have shared email with me and offered to help me *as in person*. Hope you have a great week!
>> "—Ray" (Emphases added.)

Immediately after the library confrontation, E.T. called Myer to tell him what happened. After learning about Kamila's actions, Myer met with Kamila for a second time and informed Kamila that he was no longer welcome at Campus Christians events and reiterated that Kamila must stop contacting E.T. Kamila responded by sending Myer threatening text messages from multiple phone numbers and filing a police report alleging that Myer assaulted him. The assault claims were later deemed not credible by the Lawrence Police Department. Kamila, for his part, denied that this second conversation with Myer ever took place and stated that he was never asked to stop contacting E.T. He also described the library incident much differently and claimed that E.T. waved at him when he walked in, acted very friendly towards him, and told him that he could sit at her table. Finally, Kamila denied having any romantic interest in E.T.

E.T. filed a formal IOA complaint against Kamila and requested that a No Contact Directive be issued. Kamila was notified of both the complaint and the order of no contact later the same day. In the complaint, E.T. stated that she was having nightmares about the possibility of Kamila hurting her or her friends as well as him potentially stalking her outside of her residence hall. She also claimed she was experiencing an increased level of anxiety, which made it more difficult for her to concentrate in class and focus on her homework. Later, at the administrative hearing, E.T. reported that she lost 7 to 10 pounds in a month because she was too scared to eat, that she needed people to walk her to and from classes and sit with her at work because she was never sure if Kamila would show up, and that she had to request accommodations on her finals because the anxiety had caused her to "'shut down.'"

## ANALYSIS

The KJRA governs judicial review of agency actions. K.S.A. 77-603(a). Under the KJRA, a court may grant relief on judicial review in limited circumstances. See K.S.A. 77-621(c) (reviewing court shall grant relief only when it determines that agency violated

one or more of eight provisions listed). An appellate court exercises the same statutorily limited review of the agency's decision as does the district court, so we review the agency's decision as if it had been appealed directly to this court. *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010); see K.S.A. 77-623 ("Decisions on petitions for judicial review of agency action are reviewable by the appellate courts as in other civil cases."). The party asserting the invalidity of an agency's action bears the burden of proving invalidity. K.S.A. 77-621(a)(1); *Bd. of Cherokee County Comm'rs v. Kansas Racing & Gaming Comm'n*, 306 Kan. 298, 318, 393 P.3d 601 (2017).

The agency decision at issue here is set forth in the August 24, 2017 letter from the Vice Provost informing Kamila of the University's decision to expel him from the University for nonacademic misconduct and to ban him from campus for a period of 10 years. In support of his claim that the University's actions in expelling him are invalid, Kamila relies on the following three statutory provisions:

1. The University acted beyond the jurisdiction conferred by any provision of law (K.S.A. 77-621[c][2]);
2. The University's findings and resulting sanctions are based on determinations of fact that are not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole (K.S.A. 77-621[c][7]); and
3. The University's actions are otherwise unreasonable, arbitrary, or capricious (K.S.A. 77-621[c][8]).

1. *Jurisdiction*

The KJRA allows a court to reverse a decision by an administrative agency if "the agency has acted beyond the jurisdiction conferred by any provision of law." K.S.A. 77-

621(c)(2). Kamila argues the University expelled him for off-campus conduct, which is an agency action beyond the jurisdiction conferred by the University's own Student Code and by Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 (2016) (Title IX).

*Student Code*

As used in the Student Code, "[t]he term 'jurisdiction' applies to behavior (1) on University premises; (2) at University sponsored activities; (3) off-campus when the behavior affects the on-campus safety of a member of the University community or University operations; or (4) when the University is required by law to address the behavior." On appeal, Kamila does not dispute the University's jurisdiction to discipline him for engaging in the sexual misconduct and retaliation that occurred on University premises; therefore, he has waived any claim related to that jurisdictional issue. See *State v. Williams*, 298 Kan. 1075, 1083, 319 P.3d 528 (2014) ("When a litigant fails to adequately brief an issue it is deemed abandoned."). Instead, his sole argument is that the off-campus conduct attributed to him is insufficient to confer jurisdiction on the University to sanction him under the Student Code because there was no evidence presented at the hearing to establish that he was physically located on campus at the time he engaged in the sexual misconduct and retaliation.

Interpretation of administrative regulations presents a question of law subject to de novo review; we give no deference to an agency's interpretation of its regulations. *Central Kansas Medical Center v. Hatesohl*, 308 Kan. 992, 1002, 425 P.3d 1253 (2018). We interpret the Student Code as we would a statute. See *Yeasin v. University of Kansas*, 51 Kan. App. 2d 939, 951-52, 360 P.3d 423 (2015). The most fundamental rule of statutory construction is that the intent of the legislative body governs. *Harsay v. University of Kansas*, 308 Kan. 1371, 1381, 430 P.3d 30 (2018). An appellate court must first attempt to ascertain the legislative intent through the statutory language enacted,

giving common words their ordinary meanings. *Nauheim v. City of Topeka*, 309 Kan. 145, 149, 432 P.3d 647 (2019). Where a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found in its words. *Harsay*, 308 Kan. at 1381. Only if the statute's language or text is unclear or ambiguous does the court resort to canons of construction or use the legislative history to construe the legislative body's intent. *Nauheim*, 309 Kan. at 150.

By our reading of the plain language, the University has jurisdiction to discipline University students and organizations when they engage in nonacademic misconduct off-campus when the misconduct affects the on-campus safety of a member of the University community or University operations. Kamila disagrees about the plainness, contending the language "is ambiguous because it casts a wide net of general authority over *any remote act*, *by anyone*, that might cause any student to feel slightly less safe while on campus." Given this ambiguity, Kamila argues we must look to the legislative history of the Student Code to determine the meaning of the language. But Kamila's interpretation of the Student Code as ambiguous stretches it beyond its breaking point. It does not, as he claims, apply to "any remote act" occurring off-campus but instead only applies to specific conduct affecting on-campus safety and University operations, which includes off-campus behavior that is detrimental to creating an "environment that is conducive to academic inquiry, a productive campus life and thoughtful study and discourse" as well as nonacademic misconduct such as sexual harassment, retaliation, harm to persons, and stalking—all of which are defined in the Student Code. Moreover, the Student Code does not apply to "anyone" but instead is limited to members of the University community. Relevant here, that includes students which the Student Code defines as:

> "[A]ll persons enrolled at the University [and] . . . also includes individuals who confirm their intent to enroll in programs or attend orientation sessions, regardless of whether the individual is actually enrolled, and those who were enrolled at the date of an alleged

23

incident. In addition, persons who withdraw after allegedly violating the Student Code or who are not officially enrolled for a particular term but who have a continuing relationship with the university are considered 'students.'"

Giving those words their ordinary meanings, the jurisdictional scope of the Student Code is clear and unambiguous. See *Nauheim*, 309 Kan. at 149-50. As a result, we will not speculate about the legislative intent behind that clear language or read into it provisions that do not already exist. See *Harsay*, 308 Kan. at 1381. Nor will we, as Kamila suggests, look to the Student Code's alleged legislative history to divine the intent behind the plain language of the provision. See *Nauheim*, 309 Kan. at 150.

*Title IX*

Kamila claims the University acted beyond the jurisdiction conferred by Title IX by investigating and disciplining him for off-campus conduct. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a) (2016). Under Title IX, a school receiving federal funds may be liable for its own conduct in being deliberately indifferent to student-on-student harassment that is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 633, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999).

Kamila cites to *Davis* and *Roe v. St. Louis University*, 746 F.3d 874 (8th Cir. 2014), to support his claim that the University did not have jurisdiction to investigate and discipline him for off-campus conduct under Title IX. Specifically, he cites these cases for the legal principle that an educational institution subject to Title IX is liable for its own misconduct only when the institution exercises significant control over the harasser.

24

526 U.S. at 645. Kamila then incorporates this legal principle into the following jurisdictional argument:

- The University disciplined him based on findings of off-campus misconduct.
- Because the University did not exercise significant control over any off-campus conduct in which he engaged, the University is not liable under Title IX for any of his off-campus conduct.
- Because the University is not liable under Title IX for any for any of his off-campus conduct, the University did not have jurisdiction under Title IX to investigate or discipline him for any off-campus misconduct.

But Kamila's argument on this point is a logical fallacy; specifically, a red herring. A red herring is a diversionary tactic used in an argument that introduces an irrelevant issue, usually to avoid addressing the key argument. Kamila's argument is a red herring because it introduces an irrelevant issue into the argument—that the University can be liable for its own misconduct when it exercises significant control over a harasser—when the issue he presents for decision is whether the University had jurisdiction to investigate and sanction him for off-campus misconduct under Title IX.

Moreover, Kamila's argument fundamentally misrepresents the purpose of Title IX, which is not—as Kamila suggests—to place limits on jurisdiction to investigate discrimination and harassment on the basis of sex in the educational setting. See 20 U.S.C. § 1681 et seq. Instead, the purpose of Title IX is to impose an affirmative duty on educational institutions receiving federal funds to take immediate and appropriate steps to investigate and end possible student-on-student sexual misconduct or face liability as a result. See *Goldbarth v. Kansas State Board of Regents*, 269 Kan. 881, 890-91, 9 P.3d 1251 (2000). Title IX regulations are enforced and investigated by the United States Department of Education Office for Civil Rights. The ultimate penalty that can be imposed on the educational institution for noncompliance with Title IX regulations is to

cut off federal funding to the educational institution, including monies earmarked for student loans. 20 U.S.C. § 1682 (2016). Contrary to Kamila's argument, there is no provision in Title IX that places limits on jurisdiction to investigate discrimination and harassment on the basis of sex in the educational setting. See 20 U.S.C. § 1681 et seq.

In sum, the University has jurisdiction under its Student Code and its sexual harassment policy to discipline University students and organizations when they engage in nonacademic misconduct off-campus when the misconduct affects the on-campus safety of a member of the University community or University operations. This policy encompassing off-campus misconduct is consistent with the United States Supreme Court's mandate that a school receiving federal funds may be liable under Title IX for its own conduct in being deliberately indifferent to student-on-student pervasive sexual harassment and retaliation that "effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633. Kamila's arguments to the contrary are unavailing.

2. *Sufficiency of the evidence*

Kamila claims there was insufficient evidence to support the University's decision to expel him. Under K.S.A. 77-621(c)(7), we may grant relief if the agency's action is based on a determination of fact that is not supported "by evidence that is substantial when viewed in light of the record as a whole." The phrase "in light of the record as a whole" includes evidence both supporting and detracting from an agency's finding. K.S.A. 77-621(d). As a result, we must determine whether the evidence supporting the agency's factual findings is substantial considering all the evidence. *In re Equalization Appeal of Wagner*, 304 Kan. 587, 599, 372 P.3d 1226 (2016). Evidence is substantial when a reasonable person would accept it as sufficient to support a conclusion. *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019). When reviewing the evidence in light of the record as a whole, we do not "reweigh the evidence or engage in de novo review."

K.S.A. 77-621(d). So even if there appears to be evidence supporting the University's decision, Kamila's claim here requires us to consider whether that evidence "'has been so undermined by cross-examination or other evidence that it is insufficient to support the agency's conclusion.'" *Romkes v. University of Kansas*, 49 Kan. App. 2d 871, 889, 317 P.3d 124 (2014).

*B.W.*

With regard to B.W., the University determined that Kamila violated the Student Code by engaging in sexual misconduct, retaliation, behavior endangering the health or safety of a person, and stalking. The University issued a letter informing Kamila of its decision to expel him and provided a detailed factual basis for its decision. Highly summarized, the letter set forth the following findings of fact: (1) Kamila used multiple mediums, including fake phone numbers and alias Facebook accounts, to contact B.W. and her friends, even after he was told multiple times to stop and issued a no-contact directive by the IOA; (2) Kamila sent flowers to B.W.'s unlisted and off-campus address anonymously; (3) Kamila's actions were designed to initiate a romantic relationship with B.W. and were therefore based on sex or gender stereotypes; (4) Kamila retaliated against B.W., after his advances were spurned, by making derogatory statements about her, her family, and her friends and by publishing defamatory flyers about her church group in Jayhawker Towers; and (5) Kamila's denials of some these actions and his version of events were both not credible.

Kamila claims the evidence supporting the University's finding that he sent B.W. and her friends messages from fake phone numbers and alias Facebook accounts—and that he also sent B.W. anonymous flowers on Valentine's Day—was thin, at best, and did not rise to the level of substantial evidence. In particular, Kamila takes issue with what he calls the "suppositions" underlying the University's findings—namely that he was the only one that had an issue with B.W. and her friends and that he was the only one that

27

used the phrase "as in person"—and argues that the findings are not based on evidence but instead on pure speculation. But the University's finding that Kamila was responsible for the anonymous messages was not based on the fact that he was the only one who might have an issue with B.W. Rather, its finding was based on the content of the messages themselves—which it found to contain similar themes, common spellings, and unusual phrases—as well as what the administrative panel determined was Kamila's motive to develop a romantic relationship with B.W.

In reviewing the citations to the record in his brief, it appears that the true basis for Kamila's claim of insufficient evidence with respect to B.W. is that there are disputed issues of fact in the administrative hearing transcript: Kamila repeatedly testifies that he did not engage in any of the alleged misconduct while B.W. and her witnesses—Brother, Lorenzo, McCreery, and J.L.—testified that he did. But after personally watching all the witnesses testify, hearing the substance of that testimony, and considering the documentary evidence presented, the administrative hearing panel expressly determined Kamila was not credible:

- Kamila said B.W. voluntarily communicated with him in person at a conference, and he had a photo of her to prove it. Kamila produced a photo but B.W. was not in the picture. B.W. testified she did not attend the conference. The hearing panel determined Kamila's testimony was not credible.
- Lorenzo testified that the first time he told Kamila to stop contacting B.W., Lorenzo believed it was a good conversation after which Kamila felt remorseful for inadvertently making B.W. feel uncomfortable. Lorenzo testified that the second time he told Kamila to stop contacting B.W., the conversation was very different; Kamila reacted defensively and said Lorenzo did not understand the situation. Kamila testified at the hearing that Lorenzo did not ever have a conversation with him asking him to stop contacting B.W. The hearing panel determined Kamila's testimony was not credible.

- Kamila denied creating and using a Facebook account under the name Jake Foster. In light of the contradictory evidence in the record, the hearing panel determined that Kamila's denial was not credible.

- Kamila testified that he never sent messages from any Facebook page other than his own, including from an account under the name Morgan Hashford. The hearing panel determined that Kamila's testimony was not credible and concluded from the evidence presented at the hearing that Kamila did send messages from a Facebook account under the name Morgan Hashford.

The hearing panel's credibility decision is not one this court can or should overturn. K.S.A. 77-621(d) (in deciding whether there is sufficient evidence to support an agency's decision, court looks at confirming as well as detracting evidence, *the agency's credibility determinations*, and agency's explanations for its ruling); see *Hudson v. Kansas Public Employees Retirement System Bd.*, 53 Kan. App. 2d 309, 317, 388 P.3d 597 (2016) ("Personal observation is important because the statute specifically notes the value of actual observation of the witness when credibility determinations are made.").

Next, Kamila claims that evidence supporting the University's finding that he retaliated against B.W. by posting defamatory flyers about her church group in Jayhawker Towers was not substantial. Kamila argues the camera footage only showed him entering the Towers and nobody testified that they actually saw him posting/distributing the flyers. Although there was no direct evidence that Kamila posted the flyers, there was indirect evidence to support a reasonable inference that he did so. A reasonable person could infer from the content of the flyers and Kamila's proximity to where they were posted at the time they were posted that Kamila was the person who posted them.

Finally, Kamila claims there is an underlying legal flaw in the University's finding that he was the one to post the flyers; specifically, the University failed to expressly state

that—by a preponderance of the evidence—he was "the person who entered Jayhawker Tower[s] and posted the flyers."

In its recommendation to the Vice Provost, the hearing panel found by a "preponderance of the evidence" that

"[o]n 4/4/17, Mr. Kamila is captured on KU Housing security footage entering Jayhawk[er] Towers A & C 'at times consistent with the distribution' of disparaging fliers with pictures and names of leaders and a student of Called to Greatness and Morningstar Church, including [names omitted]. The flier calls for students to call 911 if they see these individuals because they are 'pedophiles' and members of a 'fake ministry.'"

In the decision letter to Kamila informing him of the agency's decision to expel him from the University for nonacademic misconduct, the Vice Provost stated:

"Based on a preponderance of information in the case involving [B.W.], the hearing panel has found you in violation of the Code of Student Rights and Responsibilities Article 19. After reviewing all the information in this case, I concur with the find[ing]s of the panel . . . based on the following:
. . . .
"• On 4/4/17, you are captured on KU Housing security footage entering Jayhawk[er] Towers A & C 'at times consistent with the distribution' of disparaging fliers with pictures and names of leaders and a student of Called to Greatness and Morningstar Church, including [names omitted]. The flier calls for students to call 911 if they see these individuals because they are 'pedophiles' and members of a 'fake ministry.'"

The University of Kansas is an agency of the State of Kansas. Under K.S.A. 77-526(c), an agency is required to include the following information in its initial or final order:

30

"separately stated, findings of fact, conclusions of law and policy reasons for the decision if it is an exercise of the state agency's discretion, for all aspects of the order, including the remedy prescribed and, if applicable, the action taken on a petition for stay of effectiveness. Findings of fact, if set forth in language that is no more than mere repetition or paraphrase of the relevant provision of law, shall be accompanied by a concise and explicit statement of the underlying facts of record to support the findings."

Although the decision letter does expressly identify Kamila as the person who entered Jayhawker Towers and posted the flyers, the finding of fact (by a preponderance of the evidence) expressed by the agency in its decision letter as set forth above satisfies the statutory provision requiring an agency to state its findings of facts and, if those facts are set forth in the language of the Student Code, to include a "concise and explicit statement of the underlying facts of record to support the findings." K.S.A. 77-526(c).

For all of the reasons stated above, we conclude the factual findings made by the University to support its decision to expel Kamila based on his conduct directed at B.W. are supported by evidence that is substantial when viewed in light of the record as a whole. See K.S.A. 77-621(c)(7) and (d).

*E.T.*

With regard to E.T., the University determined that Kamila violated the Student Code by engaging in sexual misconduct, behavior endangering the health or safety of a person, and stalking. On appeal, Kamila does not challenge the sufficiency of the evidence supporting the University's finding that he stalked and endangered E.T.; therefore, he has waived any claims related to those provisions. See *Williams*, 298 Kan. at 1083 ("When a litigant fails to adequately brief an issue it is deemed abandoned."). Kamila does, however, challenge the sufficiency of the evidence as it related to the University's finding that he sexually harassed E.T.

31

The University issued a letter of expulsion to Kamila providing a detailed factual basis for its decision. Highly summarized, the letter set forth the following findings of fact: (1) Kamila contacted E.T. repeatedly via text message after meeting her at an off-campus Campus Christians event; (2) Kamila was told to stop contacting E.T. because it was too much too fast and he was making her uncomfortable; (3) immediately after being told to stop contacting E.T., Kamila tracked her down and confronted her in the Anschutz Library; (4) Kamila lied about an assignment to obtain E.T.'s University e-mail address and sent her numerous messages after the confrontation in the library; (5) Kamila's behavior towards E.T. was based on sex and gender stereotypes because he wanted to be married within a year and thought that her kind and friendly nature made her a good target for that goal; and (6) Kamila's denials of some of these actions and his version of events were both not credible.

In support of his claim that there is insufficient evidence to support these findings, Kamila first argues that his conduct was not severe, pervasive, and objectively offensive. But this argument finds little support in the record. While it is true that Kamila's interaction with E.T. lasted less than a month, the relevant inquiry is the amount of interaction he had with E.T. in that short period of time. The record reflects that on April 11, Kamila texted E.T. 18 times. He sent her nine more text messages between April 12 and April 16. E.T. did not respond to any of those messages. She asked Myer for help, and Myer met with Kamila and asked him to stop contacting her. Immediately after that meeting, Kamila found E.T. at the library on campus and led her away from her table of friends, appearing "very firm." E.T. was scared he was going to hit her, and he was not making sense. E.T. told Kamila in the library it was "too much too fast." Minutes later, however, Kamila joined her at the table in the library and then took advantage of E.T.'s fear and lied about a homework assignment to obtain her e-mail address so that he could continue interacting with her. Days later, Kamila sent her another e-mail after she wrote to him to "[s]top talking to me." In his brief, Kamila appears to concede that, for at least the last three days of their interactions, E.T.'s behavior indicated she feared for her life.

The library incident, in which Kamila blatantly ignored Myer's and E.T.'s express requests to leave her alone and confronted E.T., is severe behavior that would offend and scare any reasonable person. But that incident does not stand in isolation; it must be viewed in light of the full pattern of Kamila's pervasive text, e-mail, and personal communications, which includes 38 messages in 11 days, 9 of them going with no response. As explained above, the text messages were unwelcome and were the reason E.T. sought help from Myer. We find sufficient evidence supports the finding that Kamila's conduct amounted to severe, pervasive, and objectively offensive behavior as defined by the University's sexual harassment policy.

Next, Kamila claims that even if his behavior could be considered harassment, there is no evidence to suggest that it was based on gender or sex stereotypes. To support this claim, Kamila points to (1) E.T.'s testimony that she never received any messages with a romantic connotation and (2) his own testimony that he never viewed E.T. as a potential romantic partner. But this argument ignores Myer's testimony about how Kamila had expressed a desire to be married within a year. Kamila's argument also ignores Myer's testimony that Kamila appeared to single out E.T. at Campus Christians events in a way that indicated he wanted to build a friendship with the hopes that it would become a romantic relationship. And finally, Kamila's argument ignores E.T.'s testimony that Kamila had told other guys within Campus Christians that he wanted to pursue a wife while at the same time singled her out from the other women in the group. So while it is true that Kamila never expressly told E.T. that he had a romantic interest in her, there is sufficient evidence from which a reasonable person could infer that Kamila's conduct towards her was based on gender or sex stereotypes.

We conclude the factual findings made by the University to support its decision to expel Kamila based on his conduct directed at E.T. are supported by evidence that is substantial when viewed in light of the record as a whole. See K.S.A. 77-621(c)(7) and (d).

3. *Arbitrary and capricious*

Kamila argues that the University's decision to expel him was arbitrary and capricious because: (1) he was denied procedural due process when the University based its investigation—and its decision to expel him—on prior, unsubstantiated allegations; (2) he was not given an equal opportunity to present his case during the disciplinary hearing; and (3) the University failed to make specific findings of fact.

A court may grant a petitioner relief if it determines that the agency action is unreasonable, arbitrary, or capricious. K.S.A. 77-621(c)(8). "Under Kansas law, an agency acts arbitrarily and capriciously when its actions are overtly and patently in violation of the law or are unreasonable and without foundation in fact." *Romkes*, 49 Kan. App. 2d at 892; see *Via Christi Hospitals Wichita, Inc. v. Kan-Pak, LLC*, 310 Kan. 883, 891, 451 P.3d 459 (2019) ("'Essentially, the test under K.S.A.77-621[c][8] determines the reasonableness of the agency's exercise of discretion in reaching its decision based upon the agency's factual findings and the applicable law.'"); *In re Protests of Oakhill Land Co.*, 46 Kan. App. 2d 1105, 1115, 269 P.3d 876 (2012) ("A challenge under K.S.A. 2010 Supp. 77-621[c][8] attacks the quality of the agency's reasoning."). Useful factors for evaluating arbitrary and capricious claims "include whether the agency's explanation of its action runs counter to the evidence before it and whether the agency's explanation is so implausible that it could not be ascribed to merely a difference in views." *Romkes*, 49 Kan. App. 2d at 892.

*Procedural due process in the investigation and hearing*

Kamila argues that the University's decision to expel him was arbitrary and capricious because it was based, in part, on prior unsubstantiated allegations of misconduct, not on evidence obtained through an adequate, reliable, and impartial investigation. First, Kamila claims the IOA investigator told B.W. and Brother that he

34

was already familiar with Kamila from previous complaints, which suggests that the investigator already had made up his mind about Kamila based on prior unsubstantiated allegations of misconduct before the investigation began. But there is nothing in the record to indicate that the investigation into Kamila's conduct was biased, rushed, or influenced by outside pressure or politics; in fact, quite the opposite. Not only did the IOA review an extensive amount of documentary evidence, but it also conducted interviews with the victims and potential witnesses as well as with Kamila.

Next, Kamila alleges the University used unverified reports indicating that he was expelled from Kansas State University for sexual misconduct, a final Protection from Stalking order (PFS) from Sedgwick County that expired in 2015, and other IOA complaints as evidence against him to support his expulsion. Kamila acknowledges this issue was not properly preserved for appellate review because he failed to raise it at either the administrative or district court proceedings below. See K.S.A. 77-617 (limiting judicial review of issues not raised before the agency).

But even if Kamila had properly preserved the issue, his argument would not entitle him to relief. On August 10, 2017, the University hearing panel held an administrative evidentiary hearing in this matter. On August 17, 2017, the University hearing panel sent a letter to the Vice Provost for Student Affairs recommending that Kamila be expelled. The 23-page, single-spaced letter set forth detailed findings of fact, conclusions of law, and policy reasons for its recommendation. After recommending the sanction of expulsion and the reason for such a severe sanction, the hearing panel stated that it

> "did not consider other pending cases at The University of Kansas or at other universities or courts when making a determination for responsibility. Information shared in the hearing materials and hearing regarding other situations were considered to determine sanctions. [Kamila] admitted to being expelled or suspended from Kansas State University for 'disciplinary actions',

35

has an Order of Final Protection from Stalking issued by the Sed[g]wick County, KS District Court and currently has two other No Contact Directives at the University of Kansas. While these were not considered for the purposes of deciding whether [Kamila] violated University policy with respect to [B.W.] and [E.T.], *these facts show a pattern of behavior and lack of understanding or ability to comport himself appropriately that only further confirms our sanction recommendation*." (Emphasis added.)

Based on the placement and the content of this language, it appears the hearing panel believed the information from Kansas State University, the PFS order from Sedgwick County, and the other IOA complaints simply confirmed what it already had recommended—that the sanction of expulsion was the appropriate one. But even if we were to construe the hearing panel's postrecommendation statement as a stated basis for its decision to recommend expulsion, the agency decision from which Kamila appeals is not the hearing panel's recommendation but instead the August 24, 2017 letter from the Vice Provost informing Kamila of the University's decision to expel him from the University for nonacademic misconduct. Unlike the hearing panel, the agency decision does not rely on the information from Kansas State University, the PFS order from Sedgwick County, or the other IOA complaints in determining sanctions, as evidence against him to support his expulsion:

> "I carefully considered the hearing panel's recommended sanctions. I gave weight to the severity of your conduct toward [B.W.] and [E.T.], particularly when you were on prior notice regarding University expectations and policies prohibiting sexual harassment and stalking. You had every opportunity to conform your behavior to University standards, including through prior interactions with IOA and after receipt of notice of the investigations that formed the basis for this action, and still did not do so. This illustrates your conduct would be likely to continue and threaten additional members of the University community if allowed to remain at KU. In addition, you have not exhibited any awareness that you understand the seriousness of your behavior or given any indication that you are willing or able to be educated to prevent future behavior along the same lines.

36

As a result of the foregoing, you are hereby . . . [e]xpelled from the University . . . without terms for readmission."

*Equal opportunity to present case*

Kamila argues that the University's findings were arbitrary and capricious because he was not given an equal opportunity to present his case before the hearing panel. In support of this claim, Kamila notes that the hearing panel "never found [him] to be credible on any subject, but found [B.W.], [E.T.], and all of their witnesses to be entirely credible." He specifically points to the order in which the witnesses testified. For example, he notes that before he had an opportunity to testify, Brother testified that "he 'didn't want [Kamila] to shoot up a school or murder [B.W.].'" As a result, Kamila claims the hearing panel "was looking down on a dangerous man who may shoot up the school" by the time he was able to give his side of the story. Kamila concludes these circumstances made it impossible for him to get a fair hearing.

While it is true that Brother made some hyperbolic statements during his testimony, he quickly identified them as such and, beyond mere speculation, Kamila points to no evidence that those comments improperly influenced the hearing panel. There is similarly no evidence to suggest that the hearing panel was in any way biased against Kamila. And the record reflects that Kamila had an ample opportunity to present his case. He received notice of the formal hearing at least two weeks in advance and already had hired an attorney to represent him before he received that notice. In the notice he received, Kamila was advised of the detailed factual allegations lodged against him and the applicable sections of the Student Code he was alleged to have violated. Kamila was advised that he could have up to three advisors attend the hearing, that he could submit written materials into the Formal Hearing Panel file, and that he could review the entire Formal Hearing Panel file beginning three days before the hearing.

At the hearing, Kamila appeared in person and with his attorney, who cross-examined both of the alleged victims and three of the five witnesses presented by B.W. and E.T. Kamila had the opportunity, but declined, to cross-examine the other two. Kamila presented testimony from two witnesses and testified on his own behalf in the form of an uninterrupted narrative, where he had the opportunity to "to tell [his] side of the story" and "explain [himself]." Before the hearing, Kamila submitted 137 pages of documentary evidence for review by the hearing panel and referenced that evidence during his testimony. After Kamila's testimony, Kamila gave a closing statement.

The record reflects Kamila had the opportunity to, and did, vigorously defend himself at the hearing against the IOA allegations. Kamila had the opportunity to cross-examine all of the witnesses (including B.W. and E.T.), to testify in his own defense, and to present evidence supporting his version of events. That the hearing panel did not ultimately believe his story does not mean that he was not given an equal opportunity to be heard.

### Specific findings of fact

Finally, Kamila claims that the decision to expel him was arbitrary and capricious because the University failed to make specific findings of fact. But the record itself disproves Kamila's claim. The hearing panel's decision in this matter was 23 pages long. The Vice Provost's letter expelling Kamila was 19 pages long. Both letters set forth countless specific and detailed factual findings, along with rationale for their findings, recommendations, and decisions.

Affirmed.